Joe BROUSSARD, II et al., Appellants,

v.

TEXACO, INC. et al., Appellees.

No. B–2973.

Supreme Court of Texas.

April 5, 1972.

Rehearings Denied May 17, 1972.

McGinnis, Lochridge & Kilgore, Frank Douglass and William H. Bingham, Jr., Austin, for appellants.

Crawford Martin, Atty. Gen., Linward Shivers, Asst. Atty. Gen., Stayton, Maloney, Black, Hearne & Babb, John W. Stayton, Austin, William R. Dotson, Dallas, C. E. Nadeau, Houston, Small, Herring, Craig & Werkenthin, Richard Craig, Austin, for appellees.

STEAKLEY, Justice.

This is a direct appeal from a trial court summary judgment denying an injunction against the enforcement of a force pooling order of the Railroad Commission.[1] The problem is an original one of statutory construction and the question is whether the order is within the authority granted the Commission by the Mineral Interest Pooling Act of 1965, Art. 6008c, Vernon's Ann.Civ.St. We hold it was not.

The facts are undisputed. Joe Broussard, II, et al., appellants, are the royalty mineral interest owners under an oil and gas lease dated May 7, 1934, called the Broussard lease, embracing an original 733.34 acres in the Magnet Withers Field in Wharton County, Texas. Appellee, Texaco, Inc., is the lessee. The lease agreement had no pooling provisions. Production in the separate reservoir in question was discovered on January 30, 1963. The Railroad Commission designated this reservoir as the Magnet Withers (F–10 East) Field, and adopted field rules after notice and hearing, effective November 16, 1964. All references to the field, rules, productive acreage and units relate to the F–10 East reservoir. Among other provisions, the field rules provide for 40-acre proration units to be assigned to wells in the field and 40 acres is the standard proration unit for the reservoir. In addition, there is a tolerance acreage provision in the proration unit rule which provides that

1. The appeal presents the validity or invalidity of the administrative order of the Commission and the jurisdiction of this court rests on Art. 5, Sec. 3-b of the Texas Constitution, Vernon's Ann.St. Art. 1738a, and Rule 499a, Texas Rules of Civil Procedure. See Bryson v. High Plains Underground Water Con. Dist., No. 1, 156 Tex. 405, 297 S.W.2d 117 (1957); Board of Water Engineers v. Colorado River Municipal Water Dist., 152 Tex. 77, 254 S.W.2d 369 (1953). Statutory references are to Vernon's Annotated Civil Statutes.

acreage in excess of 40 acres may be assigned to the last well drilled, not to exceed 20 additional acres. Well allowables are based 100% on acreage.

The Broussard 733.34 acres is shown on the attached schematic drawing northeast of the line which we have marked with numerals I–II–III–IV to denote the division line between this tract and the A. C. Thompson 900.94 acres. On the Broussard lease 476 acres are oil productive and 296.79 acres were assigned in whole or in part to producing well units formed by Texaco as of the pertinent dates of June 20, 1967, and November 22, 1967. This left a total of 179.21 producing acres of the Broussard lease unassigned to producing units.

Adjacent to the Broussard lease to the southwest is Texaco's A. C. Thompson 900.94 acre lease, of which 204.20 acres are oil productive. On the relevant dates 88.65 acres had been assigned to well units, leaving a total of 115.55 productive acres which had not been drilled or assigned to well units. This unassigned productive acreage on the Thompson lease is shown between numerals 5–6–7–10–11 on the schematic drawing.

On August 12, 1964, Texaco entered a joint operating agreement with Shell Oil Company, The Gray Wolfe Company and Atlantic Refining Company unitizing and pooling all of their leases and operations between the subsurface intervals which included the F–10 East reservoir of the Magnet Withers Field. Thus, as far as the working interests were concerned, Texaco had pooled its Broussard and Thompson leases for all purposes, and Texaco was designated as the operator. Under this unitization of working interests, Texaco proposed to drill a well on a 42.034 acre unit comprised of 26.692 acres of the Broussard tract and 15.342 acres of the Thompson tract. The unit is shown on the sketch between numerals 1–2–3–4–5–6–7–8. The proposed well site was on Broussard land in the northeast corner of the unit and only 150 feet from the northwest line which divided the Broussard 26.692 acres from a Broussard producing unit of 44.5 acres designated on the sketch as MW Oil N–1 unit. The royalty owners on the Thompson tract approved the proposed unit and with Texaco owning both leases, the Broussard royalty owners were the only owners being force pooled into the unit against their will and over their objections.

Invoking Art. 6008c, Texaco petitioned the Railroad Commission at a June 20, 1967, hearing to force pool the 26.692 acres out of the Broussard tract with the 15.342 adjoining acres out of the Thompson tract to form the forced pool 42.034-acre unit. The 26.6 productive acres in the Broussard lease lie in the extreme southwest portion and are indicated on the sketch between numerals 1–2–3–4–5–8. Two 40 acre Broussard producing units lie to the east and separate the 26.6 acres from other Broussard acreage to the east. Immediately north is the above mentioned Broussard unit of 44.5 acres. There is no Broussard productive acreage to the southwest of the 26.6 acres. None of the remaining productive but undrilled and unassigned 153 Broussard acres was adjacent to the 26.6 acres, the latter having been isolated by the manner in which Texaco formed intervening units on the Broussard land, in some instances with the approval of the Broussard royalty owners.

The 15.342 acres of the Thompson lease lie in the extreme southeast portion of the Thompson productive acreage, as shown on the sketch between numerals 5–6–7–8. The line designated by our numerals 4–5–6–7–10 marks the southwest limit of the productive area of the reservoir in question.

The Commission granted Texaco's request over the Broussard's protest by entering a force pooling order dated November 22, 1967, forming the 42.034-acre MW Oil S–15 O/A Unit for the Magnet Withers Field. The Broussards claim this order was unauthorized by law and resulted in an unlawful reduction of their royalty interest. They appealed the order of the Commission. All parties filed motions for summary judgment in the trial court and that of Texaco, et al., was sustained. The trial court thus held the order valid and refused to enjoin its enforcement. The Broussards then instituted this direct appeal.

The question is whether the Commission may, at the instance of Texaco under the circumstances here, require the force pooling of the Broussard leftover acreage of 26.6 acres with 15.342 acres out of the adjoining large Thompson tract so as to form the 42.034 unit in question. This presents an intricate problem of construing the legislative determinations in Sec. 2(a) of Art. 6008c. We quote the section in full with spacing between some of its parts for easier reference:

"Sec. 2. (a) When two or more separately owned tracts of land are embraced within a common reservoir of oil or gas for which the Railroad Commission of Texas (hereinafter called 'Commission') has established the size and shape of proration units, whether by temporary or permanent field rules, and where there are separately owned interests in oil and gas within an existing or proposed pro-

ration unit in the common reservoir, and the owners have not agreed to pool their interests, and where at least one of the owners of the right to drill has drilled or has proposed to drill a well on the existing or proposed proration unit to the common reservoir, the Commission, to avoid the drilling of unnecessary wells, or to protect correlative rights, or to prevent waste, shall, on the application to the Commission of the owner of any interest in oil and gas in an existing proration unit or with respect to a proposed unit, the owner of any working interest or any owner of an unleased tract other than a royalty owner, establish a unit and pool all of the interests therein within an area containing the approximate acreage of such proration unit, which unit shall in no event exceed 160 acres for an oil well or 640 acres for a gas well plus 10% tolerance.

The applicant shall set forth in detail the nature of voluntary pooling offers made to the owners of the other interests in the proposed unit, and the Commission shall dismiss such application if it finds that a fair and reasonable offer to voluntarily pool has not been made by the applicant. An offer by any owner of a royalty or any other interest in oil or gas within an existing proration unit to share on the same yardstick basis as the other owners within the existing proration unit are then sharing shall be considered a fair and reasonable offer.

The Commission shall not require the owner of a mineral interest, the productive acreage of which is equal to or in excess of the standard proration unit for the reservoir, to pool his interest with others, unless requested by the holder of an adjoining mineral interest, the productive acreage of which is smaller than such pattern, who has not been provided a reasonable opportunity to pool voluntarily, in which event the Commission shall pool the smaller tract with adjacent acreage on a fair and reasonable basis and may authorize a larger allowable for such unit if it exceeds the size of the standard proration unit for the reservoir. The Commission shall only pool such acreage which at the time of its order reasonably appears to lie within the productive limits of the reservoir."

It is seen that the opening sentence of Sec. 2(a) authorizes the Commission upon proper application to pool separately owned oil and gas interests in a common reservoir under circumstances where at least one of the owners has drilled or has proposed to drill a well, the pooled area to contain the approximate acreage of the established proration unit for the reservoir. There is no express indication of the size of the tracts of land to which this general grant of authority was intended to be effective. Sec. 2(d) recognizes that the Commission may include only a part of a tract in establishing a unit.[2] The succeeding two sentences in Sec. 2(a) are concerned with pooling offers made by an applicant to the owners of other interests in the proposed unit and there is no point as to this before us. It is then provided in the succeeding sentence, commonly known as the "muscle in" clause, that the Commission shall not require the force pooling of a mineral interest with production acreage equal to or greater than the standard proration unit unless requested by the owner of a mineral interest with production acreage smaller than the production pattern who has not been provided a reasonable opportunity to pool voluntarily. Here again there is no expressed indication of the size of tracts to which the

2. " . . . If only part of a tract is included in the unit, operations upon, production from, or a shut-in gas well on, the unit shall maintain an oil and gas lease on the tract as to the part excluded from the unit only if the lease thereon would be maintained had the unit been created voluntarily under the provisions of the lease. . . . "

provision is applicable. There is the question of whether in situations within the ambit of the muscle in clause the Commission is required to pool the entire mineral interest in the adjoining large tract upon request of the owner of an adjoining small tract, or may combine the small tract with a part of the large tract so as to form a unit. With respect to this, the Commission is directed to pool the small tract with the adjacent acreage on a fair and reasonable basis which may or may not exceed the size of the standard proration unit for the reservoir, and may authorize a larger allowable if the unit so established exceeds the standard unit.

In attacking the Commission order the Broussards contend that the last two sentences in Sec. 2(a) were designed to allow a small tract owner to force pool into a larger tract or unit of an adjoining owner even though the large tract owner does not need the small tract acreage for development or proration unit purposes. They say it was for the protection of the small tract owner who does not have sufficient acreage for an economically feasible development on his own tract and which otherwise would be drained away by the well on the larger tract. At the same time the Broussards assert that the clause is a limitation on the preceding general pooling provisions of Sec. 2(a) in that it prohibits the Commission from forcing the owner of a mineral interest in excess of the standard proration unit for the field to pool unless there is an adjacent tract containing less than the amount needed for a standard proration unit. They argue that both the Broussard and Thompson tracts are large tracts, each with production acreage equal to or in excess of the standard size unit for the reservoir. They point out that the Thompson large tract contains a total of 115.55 contiguous productive but undeveloped acres and therefore cannot be force pooled as a small tract needing additional acreage to form a proration unit. They also contend that Texaco is not entitled to isolate the 26.6 acres of the Broussard large tract and treat it as a "small tract" entitled to be force pooled, because it is part of a larger tract which has undeveloped productive acreage in excess of the standard proration units for the field. They suggest that Texaco could devote all of the 26.6 acres to a productive 40 acre unit on the Broussard large tract by rearranging its other units so as to provide for development of the total of 179.21 productive acres of the Broussard lease which was undeveloped and unassigned for proration purposes; or that the 26.6 acres could be assigned by the Commission as tolerance acreage to other Broussard producing units.[3]

It is the position of Texaco, on the other hand, that the Commission is empowered by the general grant of authority to force pool in the instance of small acreage left over after the formation of multiple proration units in a large tract and that, in effect, the Commission is given unlimited authority to force pool enough acreage to create a proration unit in any instance in which in its opinion such pooling is necesary to avoid the drilling of unnecessary wells, or to protect correlative rights, or to prevent waste. Texaco also says that the prohibition in the muscle in clause against force pooling of a large tract has no application to parts of mineral interests in large, multiple proration unit and multiple well tracts; but that if the muscle in clause is held to be applicable here, Texaco may nevertheless invoke its provisions. The argument as to this is that Texaco's leasehold interest in what

3. The Commission appears to have been liberal in granting numerous exceptions to its field rules which limit proration units to 40 acres for each well. Several of the present units exceed 40 acres. Unit N-1 has 44.5 acres; Unit S-1, 49.72 acres; Unit S-13, 45.716 acres; and the two well unit N-4, 88.65 acres. Also, the field rules provide for up to 20 tolerance acres to be added to the last well drilled on an otherwise fully developed lease.

is termed the isolated and only available Broussard acreage of 26.6 acres qualifies it as the holder of an adjoining mineral interest, the productive acreage of which is smaller than the standard proration unit; and that the adjoining and non-assigned 204.20 Thompson acres is available productive acreage in excess of the proration pattern, a part of which may be force pooled with the small 26.6 acre leftover Broussard tract.

We do not agree with Texaco's interpretation of the statute, particularly with respect to the specific prohibition in the muscle in clause that the Commission "shall not require the owner of a mineral interest, the productive acreage of which is equal to or in excess of the standard proration unit for the reservoir, to pool his interest with others, unless requested by the holder of an adjoining mineral interest, the productive acreage of which is smaller than such pattern . . . ." Here, Texaco is the owner of a mineral interest in two adjoining large tracts, both of which have productive acreage in excess of the standard proration unit for the reservoir. Texaco's Thompson lease has 115.55 productive and unassigned acres adjoining the Broussard lease. It requires no adjacent Broussard acreage to form a standard proration unit for the reservoir. Likewise, Texaco's 900 acre Broussard lease has 179 productive and unassigned acres. The fact that only 26.6 of these acres adjoins the Thompson lease is due solely to the unitization pattern established by Texaco on the remainder of the Broussard lease. There is no indication that Texaco purposely planned its formation of other units so as to isolate this 26.6 acres for the purpose of combining it with the less desirable 15.342 acres of the Thompson lease which lies on the extreme edge of the productive limits of the field. However, such intentional fragmentation and isolation of leftover acreage for the purpose of force pooling into more desirable units would be possible under Texaco's interpretation of the statute.

We recognized in Railroad Commission v. Coleman, 460 S.W.2d 404 (Tex.1970), that it was the intention of the Legislature in enacting Art. 6008c to save the owners and lessees of small tracts from the effect of the decisions in Normanna and Port Acres.[4] See Smith, The Texas Compulsory Pooling Act (pt. I), 43 Tex. Law Rev. 1003 (1965). While the grant of authority to the Commission in the opening sentence of Sec. 2(a) generally authorizes the establishment of pooling units with respect to separate tracts within a common reservoir, the muscle in clause was designed with particular reference to the small tract problem. There is manifest an initial legislative purpose of protecting large tracts against force pooling, but one which must yield only under circumstances where an adjacent small tract mineral interest holder has not had a fair chance to pool and will suffer the draining away of his oil and gas by the large tract. It is easily understood why the Legislature provided that such a small tract should have a fair chance to pool under these circumstances. There is no indication, however, that the Legislature also intended, or sought to provide in the statute, that the owners of productive and unassigned mineral interests in a large tract may form their system of assigned proration units in a manner so as to create a leftover "small tract" with the statutory right to be force pooled with an adjacent large tract.

We therefore conclude that the Railroad Commission was without authority to force pool parts of the Thompson and Broussard tracts at the request of Texaco under the circumstances shown and that the

4. Atlantic Ref. Co. v. Railroad Comm'n, 162 Tex. 274, 346 S.W.2d 801 (1961) (usually referred to as the *Normanna* decision), and Halbouty v. Railroad Comm'n, 163 Tex. 417, 357 S.W.2d 364 (1962) (usually referred to as the *Port Acres* decision).

order so doing was invalid. The judgment of the trial court is reversed and judgment is rendered setting aside the order of the Commission.

WALKER, Justice, not sitting.