**RAILROAD COMMISSION OF TEXAS, et al., Appellants,**

v.

**MOTE RESOURCES, et al., Appellees.**

**No. 13514.**

Court of Appeals of Texas, Austin.

Jan. 18, 1983.

**640**

Mark White, Atty. Gen., Ralph T. Aldave, Asst. Atty. Gen., Frank Douglass, Lloyd Broussard, Scott, Douglass & Keeton, Philip F. Patman, Patman & Patman, Austin, for appellants.

C.C. Small, Jr., Small, Craig & Werkenthin, Austin, for appellees.

Before PHILLIPS, C.J., and EARL W. SMITH and BRADY, JJ.

EARL W. SMITH, Justice.

Appellees Mote Resources, Inc., et al.[1] filed suit in the district court of Travis County against the Railroad Commission of Texas (hereinafter called the Commission) contending that a final order of the Commission entered on October 20, 1980, in Oil and Gas Docket No. 9–72,922 was erroneous and unlawful because it was contrary to Tex.Nat.Res.Code Ann., § 85.055 and Chapter 86, Subchapter D (1977) in that the order of the Commission attempted to prorate gas production from numerous separate and distinct common reservoirs on a consolidated basis. Plaintiffs sought to permanently enjoin the Commission from enforcing the order. Pleas of intervention, seeking to uphold the validity of the Commission's order, were filed by Mitchell Energy Corporation, Enserch Exploration, Inc., Dallas Production, Inc., American Trading and Production Corporation, and Grace Petroleum Corporation. The Commission and the intervenors are appellants.

The judgment of the trial court "ordered, adjudged, and decreed that Rule 3 of the Order of October 20, 1980 in Oil and Gas Docket No. 9–72,922, is invalid, and that said Rule 3 of said Order is reversed and set aside, and that the remainder of said Order is affirmed."

The judgment further recites that:

all parties agreed that irrespective of any findings of fact to the contrary in the Order of October 20, 1980 in Oil and Gas Docket No. 9–72,922, the effect of such Order was to commingle and prorate on a combined basis several separate and distinct lenticular accumulations of natural gas in the Boonsville (Bend Congl., Gas) Field which were not in natural communication with each other, but which had been placed in communication by normal drilling processes, completion processes and through wellbores, or a combination thereof. The parties represented to the Court that the issue to be decided by the Court is whether under such facts the Commission has the statutory authority to adopt Rule 3 in said Order. The Court ... is of the opinion that based on the issues submitted to it, the Commission is without statutory authority to adopt Rule 3 under the circumstances existing in the Boonsville (Bend Congl., Gas) Field.

Having held Rule 3 of the order invalid, and having reversed and set aside the rule, the trial judge denied the injunction.[2]

Appellants assign four points of error, all briefed and argued together. The assignments all deal with the controlling issue in this case, that is, whether the Commission

---

1. Appellees were plaintiffs in the district court. In addition to Mote Resources, Inc., they include: Twin Mountain, Inc., Sabio Oil & Gas, Inc., Coke L. Gage, C.L. Gage, Jr., Reuben B. Knight, Richey Exploration Company, Richey Drilling Company, Ryder Scott Oil Company, Decatur Glass Works, Seely Oil Company, League Oil & Gas Company, and Wolfson Oil Company. For convenience, references to Mote Resources, Inc., will include all appellees.

2. This Court, on June 17, 1981, in an original proceeding, issued an injunction *pendente lite* with respect to the order of the Commission. *See* 618 S.W.2d 877 (Tex.Civ.App.1981).

had statutory authority to adopt Rule 3 in its order. All parties acknowledge that the Commission order essentially does two things. First, it combines several accumulations of non-associated gas into one field, to be known as the Boonsville (Bend Congl., Gas) Field; second, it prorates the field as one common reservoir. The first effect of the order is not challenged by the appellees; their challenge is to the second effect—the proration element of the order. In support of the order, the Commission made a number of findings of fact.[3]

Appellants, in their brief, concede:

(1) that the basic issue in this case is whether Senate Bill 257, passed by the legislature in 1979, effective May 29, 1979,[4] has overruled the Supreme Court decision in *Railroad Commission of Texas v. Graford Oil Corp.,* 557 S.W.2d 946 (Tex.

3. Pertinent findings of fact of the Commission follow:

1. The Boonsville (Bend Congl., Gas) Field is a large non-associated gas reservoir in a conglomerate deposition consisting of a near shore delta environment covering almost all of Wise County and portions of Jack and Parker Counties.

2. The conglomerate in this field extends from the base of the Caddo Lime to the top of the Marble Falls and is a single geologic deposition consisting of numerous zones of porosity. . . .

3. Commingling the zones of porosity in this field is necessary to prevent waste, promote conservation, and protect correlative rights.

(a) Over 1000 wells in the field have more than one zone of porosity open within the wellbore.

(b) Single zone completions would result in many wells not being drilled due to low potential in many of the zones of porosity.

(c) Approximately 25 percent of the gas reserves (80 to 100 billion cubic feet) would be lost if the existing wells were required to be completed in single zones of porosity.

(d) Completion in individual zones will not recover as much gas as commingling the zones of porosity together in the wellbore.

(e) Separation of the zones of porosity in the existing wells would cost approximately $20,000,000.

(f) Commingled wells recover their reserves faster than by plugging back each individual zone after depletion.

(g) Multiple completed wells would be difficult to operate.

(h) It would be uneconomical to drill to individual zones of porosity which have low potential.

(i) Commingling results in greater deliverability of a well, as opposed to single zone completion.

(j) Operators cannot economically drill separate wells to separate zones of porosity in order to protect their property from drainage.

(k) If an operator is limited to one zone per well, or required to produce the zones separately, he cannot effectively complete in all the zones which may be subject to offset drainage.

*   *   *   *   *   *

5. Wells in the Boonsville (Bend Congl., Gas) Field are capable of draining at least 320 acres. In some areas of the field an optional 160 acre density is necessary for effective and efficient drainage.

(a) The field is currently developed on a 320 acre basic proration unit pattern.

(b) The field contained 1304 wells in July, 1979, of which 854 wells produced on units of 320 acres or more, 311 wells produced on units from 160 to 319 acres, and 139 wells (approximate 10%) produced on units of less than 160 acres.

*   *   *   *   *   *

6. Producing capability of wells in the Boonsville (Bend Congl., Gas) Field exceeds the market demand.

*   *   *   *   *   *

7. An allocation formula for the Boonsville (Bend Congl., Gas) Field based on 100 percent acreage will give each operator an opportunity to recover the reserves underlying his property.

(a) Acreage bears a reasonably close relationship to recoverable gas under the particular tracts in this field.

(b) Small tract wells currently (without proration) receive a greater percentage of total field production than their acreage participation in the field.

(c) Small tract wells currently produce a disproportionate amount of total field production.

(d) Without an effective allocation formula, small tract wells will be permitted to produce more than their fair share of the gas in place by draining the adjoining tracts.

(e) Market demand from the Boonsville (Bend Congl., Gas) Field can be met by a 100 percent acreage allocation formula.

(f) A 100 percent allocation formula will prevent drainage and protect correlative rights.

These findings of fact were not challenged by appellees.

4. 1981 Tex.Gen.Laws, ch. 300, at 673, now appearing as Tex.Nat.Res.Code Ann., §§ 85.-046(b) and 86.012(b) (Supp.1982).

1977), reaffirmed in *Gage v. Railroad Commission of Texas,* 582 S.W.2d 410 (Tex.1979);

(2) that *Gage* and *Graford* hold that the Commission is without statutory authority to combine a number of separate accumulations of oil or gas and prorate them together as a single field, and further holding that each separate accumulation of oil or gas was a "common reservoir" that must be prorated separately;

(3) that the type of field in *Graford* and the field in the instant case are of a conglomerate deposition, as opposed to being a blanket or continuous sand formation, and that the reservoir rock in such field is composed of multiple zones of porosity; that these productive zones, or lenses, as they are often called, are separated from each other both horizontally and vertically; and

(4) that in order to provide an economic incentive to produce these relatively small accumulations of oil and gas the Commission has for many years permitted operators to drill a well bore through several vertically separated lenses and produce the reserves of such lenses together through a common well bore; that the practice prevents waste in that the practice recovers oil and gas which would otherwise remain in the ground because, absent the practice, the oil and gas could not be produced economically.

We agree that the basic issue in this case is: did Senate Bill 257 overturn *Graford* and *Gage?* Appellants argue that the bill had that effect. Senate Bill 257 amended Tex.Nat.Res.Code Ann., §§ 85.046 and 86.-012 by adding a new subsection [subsection (b)] to each section. The language added in each case is identical. This language reads:

(b) Notwithstanding the provisions contained in this section or elsewhere in this code or in other statutes or laws, the commission may permit production by commingling oil or gas or oil and gas from multiple stratigraphic or lenticular accumulations of oil or gas or oil and gas where the commission, after notice and hearing, has found that producing oil or gas or oil and gas in a commingled state will prevent waste, promote conservation, or protect correlative rights.

The effective date of Senate Bill 257 was May 29, 1979. On May 23, 1979, the Supreme Court of Texas decided *Gage,* denying the motion for rehearing on June 20, 1979.

Both *Graford* and *Gage* involved the same geological facts as the instant case; *Gage* involved exactly the same geographic area as here, that is, the area designated by the Commission as the Boonsville (Bend Congl., Gas) Field located in Wise, Jack, and Parker Counties. Since *Gage* reaffirmed the legal issues decided in *Graford,* we will analyze the decision in *Gage.* There the Court held, "that under the Texas Administrative Procedure Act, a court may overturn a commission order if it is found that the substantial rights of the appellant have been prejudiced because [of] administrative findings, inferences, conclusions, or decisions [that] are in excess of the *statutory authority* of the commission. Tex.Rev.Civ. Stat.Ann. art. 6252–13a, § 19(e)(2) (Supp. 1982). . . . Pertinent to our inquiry here," the Court said, "is the natural resources code, which authorizes the commission to prorate the production of natural gas *only under certain defined circumstances*" (emphasis supplied). The Court cited § 85.055 of the Code which, at that time, read:

(a) If full production from wells producing gas *only from a common source of supply of gas* in this state is in excess of the reasonable market demand, the commission shall inquire into the production and reasonable market demand for the gas and shall determine the allowable production from the common source of supply.

(b) The allowable production from *a common source of supply* is that portion of the reasonable market demand that can be produced without waste.

(c) The commission shall allocate, distribute, or apportion the allowable production *from the common source of supply* among the various producers on a reasonable ba-

sis and shall limit the production of each producer to the amount allocated or apportioned to the producer.

Tex.Nat.Res.Code Ann., § 85.055. (emphasis supplied).

The Court then referred to Tex.Nat.Res. Code Ann., § 86.081 which, at that time, provided:

> For the protection of public and private interests, the commission shall prorate and regulate the daily gas well production from *each common reservoir* to:
>
> (1) prevent waste; and
>
> (2) adjust the correlative rights and opportunities of each owner of gas in a *common reservoir* to produce and use or sell the gas as permitted in this chapter. (emphasis supplied).

The Court pointed out that § 86.002(4) of the Code defined "common reservoir" to mean "all or part of any oil or gas field or oil and gas field that comprises and includes any area that is underlaid or that, from geological or other scientific data or experiments or from drilling operations or other evidence, appears to be underlaid by a *common pool* or accumulation of oil or gas or oil and gas," and that under § 85.001(2) of the Code, "common source of supply," "common pool," and "common reservoir" are synonymous terms.

The Court then pointed out that in *Graford,* "we recognized that the commission had no statutory authority to combine several common reservoirs into a single field for proration purposes. Instead, the legislature had only authorized the commission to prorate the daily gas production from '*each common reservoir*' in order to prevent waste or to adjust correlative rights."

The Court then reaffirmed its holding in *Graford,* quoting therefrom as follows:

> since we hold that a common reservoir consists of a common pool or a common accumulation of hydrocarbons, separate and distinct pools of oil or gas, which are not connected, and which do not communicate with one another, do not constitute a 'common reservoir.'

The Court held that the Commission's consolidation order for proration purposes could not stand unless the consolidated order is found to be a common pool or common accumulation of hydrocarbons, stating, "while we are appreciative of the enormous regulatory and technological problems that confront the commission in the . . . conglomerate, *it is settled that separate and distinct 'common reservoirs' cannot be consolidated into a single field for administrative convenience in prorating the area.*" (emphasis supplied).

Therefore, in view of the clear holding of the Supreme Court in *Gage* and *Graford* and unless there has been a change in the statutory authority of the Commission, those decisions prohibit prorating on a consolidated basis the numerous *separate* common reservoirs of the Boonsville Field, even though they are in man-made communication through the use of common well bores.

Turning now to subsection (b) of §§ 85.046 and 86.012, added by Senate Bill 257, we hold that the language is clear and unambiguous. Nevertheless, in reading a statute, whether or not the statute is considered ambiguous on its face, a court may consider the circumstances under which the statute was enacted and the underlying legislative history of the enactment. Tex.Rev. Civ.Stat.Ann. art. 5429b–2, § 3.03 (Supp. 1982).

As originally introduced, Senate Bill 257 clearly undertook to overturn the results of *Graford* and *Gage.* In its first form, the bill read as follows:

### A BILL TO BE ENTITLED

### AN ACT

relating to the definition of "reservoir" and "common reservoir" of an oil, gas, or oil and gas field; amending Subdivision (2), Subsection (a), Section 85.001 and Subsection (4), Section 86.002 of the Natural Resources Code.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 85.001(a)(2), Natural Resources Code, is amended to read as follows:

(2) 'Reservoir,' ['Pool,'] 'common pool,' 'field,' or 'common source of supply' means a common reservoir as defined in Section 86.002(4) of this code.

SECTION 2. Section 86.002(4), Natural Resources Code, is amended to read as follows:

(4) 'Common reservoir' means all or part of any oil or gas field or oil and gas field that comprises and includes any area that is underlaid or that, from geological or other scientific data or experiments or from drilling operations or other evidence, appears to be underlaid by a common pool or accumulation of oil or gas or oil and gas, including formations or geological sequences containing multiple statigraphic or lenticular accumulations of oil or gas or oil and gas, all intervals of which may not be pressure connected but which the commission finds after notice and hearing should be operated as a common reservoir to prevent waste.[5]

This was an obvious attempt to redefine "common reservoir" to include separate lenticular formations which are in pressure communication solely through man-made means. The result of the redefinition would have been to supply the legislative authority to prorate production from such formations which the Supreme Court had found lacking in both *Graford* and *Gage.* Senate Bill 257 was not enacted in this form, however. In fact, the proposed amendments which have been set out above, were deleted from the bill. Instead, two new sections were added to that portion of the Natural Resources Code which concerns waste. Each section contains identical language that is clear and unambiguous. The effect of the bill, as passed, is to do nothing more than to put a legislative stamp of approval upon the long-standing practice of allowing the *production* of oil or gas from separate accumulations that have been connected through a common well bore. The bill makes no attempt to deal with the issue of proration. While we recognize that this method of production has been a well-established practice in the oil and gas industry, we are not willing to stretch beyond its breadth the language of Senate Bill 257 which merely sanctions the extant. The legislative history hereinbefore discussed indicates that the Legislature knew how to correct the defects spoken to in *Graford* and *Gage,* and that it had them in mind at the time the bill was introduced. By removing from the bill the language that would have overturned *Graford* and *Gage,* we are led to the inescapable conclusion that the Legislature was unwilling, at that time, to make the necessary correction.

Our opinion that the Legislature did not believe that, by passing Senate Bill 257, it had affected *Graford* and *Gage* is reinforced by the fact that, in the subsequent session, the Legislature passed a measure (Senate Bill 1146)[6] which clearly had the effect of overturning *Graford* and *Gage.*

Proration rules promulgated after the effective date of Senate Bill 1146 seem clearly valid. For this reason, our opinion affects only those rules issued during the short span of time between the effective dates of the Commission's order, dated October 20, 1980, and Senate Bill 1146 (effective June 16, 1981). Accordingly, we hold that the passage of Senate Bill 257 did not affect the holdings of *Graford* and *Gage.* The judgment of the trial court is affirmed, and the injunction issued by this Court on June 17, 1981, in Cause No. 13,490 is hereby dissolved.

---

**5.** This version of the bill was introduced at the administrative level as Smith Exhibit 17 and was included as part of the appellate record.

**6.** 1981 Tex.Gen. Laws, ch. 688, at 2578.