**PEND OREILLE OIL & GAS COMPANY, INC., Lamon L. Bennett, Jr. and Hazel Bennett Hill, Appellants,**

v.

**RAILROAD COMMISSION OF TEXAS, et al., Appellees.**

No. 13–88–581–CV.

Court of Appeals of Texas, Corpus Christi.

April 5, 1990.

Rehearing Overruled April 5, 1990.

Second Motion for Rehearing Overruled May 3, 1990.

Glenn Johnson, Dan Moody, Jr., Graves, Dougherty, Hearon & Moody, Skipper Lay, Lay & Coffey, Austin, for appellants.

Larry J. Laurent, Robert L. Seibert, Asst. Atty. Gen., Energy Div., Jim Mattox, Mary F. Keller, Atty. Gen. Office, Brian Sullivan, David Nelson, Norman M. Bonner, Austin, for appellees.

Before DORSEY, SEERDEN and KENNEDY, JJ.

### OPINION ON MOTION FOR REHEARING

KENNEDY, Justice.

All motions for rehearing are denied. Our prior opinion is withdrawn, and the following opinion is substituted in its place.

This appeal is taken from an oil and gas case involving an application of the Mineral Interest Pooling Act (Tex.Nat.Res.Code Ann. Ch. 102 (Vernon 1978)) ("MIPA"). Lamon L. Bennett, Jr. and Hazel Bennett Hill, appellants, own a royalty interest in tracts of land located within a gas field designated by the Texas Railroad Commission as the "Limes" field. Pend Oreille Oil and Gas Company, Inc., appellant, owns the working interest in the Bennetts' producing

gas well which is located in the Limes field. Bill Forney, appellee, holds an oil and gas lease on tracts of land adjacent to the Bennetts' acreage. The Texas Railroad Commission ("Commission"), appellee, granted Forney's application to force pool his tracts with those containing the Bennetts' gas well and issued a final order on August 24, 1987, pooling Forney's acreage into and with the Bennetts' existing gas well.

Pursuant to Tex.Nat.Res.Code Ann. § 102.112 (Vernon 1978) and Tex.Rev.Civ. Stat.Ann. art. 6252–13a § 19 (Vernon Supp. 1990), appellants sought review of the Commission's MIPA order in Live Oak County, the county in which the land is located. The district court affirmed the Commission's MIPA order. By ten points of error, appellants complain of the court's judgment. We reverse in part and affirm in part the judgment of the district court.

On December 22, 1983, Forney made an offer to pool his acreage into the Bennetts' gas unit. The Bennetts did not accept Forney's offer, and on January 4, 1984, Forney applied to the Commission for forced pooling under MIPA. Prior to Forney's MIPA application, Pend Oreille filed an application with the Commission to amend the Limes field rules.

The Commission held two initial MIPA hearings in which it postponed any decision regarding Forney's MIPA application until final resolution of the Limes field rules hearing ("field hearing"). The primary purpose of the field hearing was to determine the horizontal and vertical extent of the Limes field so that an appropriate net acre-feet (rather than surface acreage) allocation formula for the hydrocarbons could be established. During the field hearing, it was shown that the Limes field consists of two separate reservoirs: the main sand and the stray sand.[1] The stray sand lies directly above the main sand and covers only a portion of the Limes field. The stray sand is much thinner than the main, and it is separated from the main by six to ten feet of impermeable rock or shale. The Bennetts' well bore perforates both the stray sand and the main sand, commingling the gas from both sands and ostensibly violating Tex. R.R. Comm'n, 16 Tex.Admin.Code § 3.10 (Shepard's Sept. 1, 1988) ("Rule 10") which prohibits the commingling of hydrocarbons from multiple reservoirs. Once it was shown during the field hearing that the two reservoirs were not in natural communication, the Commission granted an exception to Rule 10, thereby allowing the continued commingling of the gas.[2]

A final order was issued by the Commission in the field hearing which changed the basis of allocation from surface acreage to net acre-feet. Because many of the issues resolved in the field hearing affected and adjusted the rights of the parties to the MIPA proceeding, the parties consented to the incorporation of the final order and its supporting exhibits into the MIPA proceeding. Ultimately, the Commission granted Forney's MIPA application and force pooled both the main sand and the stray sand. By their first three points of error, appellants contend that the Commission had no statutory authority to enter such an order. We agree.

The extent of the Texas Railroad Commission's pooling authority under MIPA follows:

> When two or more separately owned tracts of land are embraced in *a common reservoir* of oil or gas for which the commission has established the size and shape of proration units ... and the owners have not agreed to pool their interests ... the commission ... for the purpose of avoiding the drilling of unnecessary wells, protecting correlative rights, or preventing waste, shall establish *a unit* and pool all of the interests in *the unit....*

---

1. All parties concede that the Limes field consists of a main sand and a stray sand that are not in natural communication, constituting two separate reservoirs.

2. The Texas Administrative Code restricts the production of oil and gas from different strata through the same string of casing; however, the Commission may grant exceptions permitting commingling from separate reservoirs. Tex. R.R. Comm'n, 16 Tex.Admin.Code § 3.10 (Shepard's Sept. 1, 1988).

Tex.Nat.Res.Code Ann. § 102.011 (Vernon 1978) (emphasis added).

Appellants contend that because the Limes field contains two separate reservoirs, the Commission is without the statutory authority under MIPA to enter an order which pools more than "a common reservoir." On the other hand, appellees argue that once the Commission granted a Rule 10 exception, allowing both reservoirs to be produced as one, the reservoirs became "a common reservoir" within the meaning of the MIPA statute.

Although Rule 10 prohibits the production of oil or gas from different strata through the same string of casing, the Commission has the authority to grant exceptions as follows:

> After notice and hearing, the commission may grant an exception to ... [Rule 10] ... to permit production from a well or wells commingling oil or gas ... from two separate reservoirs of multiple stratigraphic or lenticular accumulations of oil or gas ... if commingled production will ... prevent waste ... promote conservation ... or protect correlative rights.

Tex. R.R. Comm'n, 16 Tex.Admin.Code § 3.10(b)(1) (Shepard's Sept. 1, 1988).

Thus, the issue before us is whether the Commission's pooling authority extends to pooling tracts of land which are underlaid by multiple deposits of gas, separate and not in natural communication, *after granting a Rule 10 exception* permitting the downhole commingling of the hydrocarbons contained in the deposits.[3] This issue has been partially decided in *Railroad Commission of Texas v. Bishop Petroleum, Inc.*, 736 S.W.2d 724 (Tex.App.—Waco 1987), *rev'd on other grounds in part, aff'd in part*, 751 S.W.2d 485 (Tex.1988). In *Bishop*, the court of appeals held that the Commission's pooling authority under MIPA is limited to pooling tracts that are embraced in a reservoir whose deposits, if separated, are in natural communication. *Bishop*, 736 S.W.2d at 729. Although the

court expressly stated that the Commission could only pool multiple reservoirs in natural communication, no fact findings were made by the Commission relative to the existence and type of communication between the deposits, or for that matter, even if they were separated. *Bishop*, 736 S.W.2d at 735. As a result, the *Bishop* court affirmed the Commission's pooling order based on the absence of fact findings supporting the complaint that the Commission had exceeded its authority by pooling multiple deposits which were not in natural communication.

Appellees contend that the position taken by the *Bishop* court on this issue is dicta because it was not the basis of the judgment. We decline to respond to this contention because, dicta or not, we find the analysis of the Waco court both comprehensive and accurate, and we choose to follow it, regardless of any arguments concerning its technical precedential status. Appellees have failed to cite legal authority contradicting the position of the *Bishop* case on this issue.

In the present case, the parties concede that the main sand and stray sand are not in natural communication, and we have fact findings before us to support that stipulation; however, that conclusion merely resolves the issue in part because the appellees argue that the Commission's prior granting of a Rule 10 exception has affected its authority under MIPA. Appellees attempt to validate the Commission's authority to issue the pooling order by showing that after the Rule 10 exception was granted, the Limes field was being treated and regulated as "a common reservoir."

After a Rule 10 exception has been granted by the Commission, the Rule provides: "Commingled production of gas ... shall be considered production from a common source of supply *for the purposes of proration and allocation*." Tex. R.R. Comm'n, 16 Tex.Admin.Code § 3.10(c) (Shepard's Sept. 1, 1988) (emphasis added).[4]

---

**3.** It is undisputed by all parties that unless the main sand and stray sand constitute one common reservoir, compliance with the jurisdictional requisites of MIPA is not possible.

**4.** MIPA does not define the term "common res-

Essentially, appellees argue that this portion of Rule 10, which is currently supported by the Natural Resources Code, impliedly authorizes the Commission to consider production, from the main sand and the stray sand, as production from a common source of supply *for the purpose of pooling under MIPA*. A short discussion of the evolution of the statutory provisions authorizing the language contained in Rule 10 is necessary to illustrate the intended meaning and scope of these terms.[5]

The Commission's authority under Rule 10 was first challenged in 1977. At that time, Rule 10 was a total prohibition of downhole commingling, contained no provision authorizing the Commission to grant exceptions, and did not allow production to be considered "from a common source of supply" for *any* purpose. In *Railroad Commission of Texas v. Graford Oil Corporation*, 557 S.W.2d 946 (Tex.1977), the Court struck down a Commission order attempting to prorate the production from nine gas fields into one field, holding that the Commission had no statutory authority to combine several reservoirs into a single field for administrative convenience in prorating the reservoirs. Later, in 1979, the Court again held that the Commission had no authority to consolidate several reservoirs for proration purposes. *Gage v. Railroad Commission of Texas*, 582 S.W.2d 410, 413 (Tex.1979).

Following these decisions, the Legislature amended the Natural Resources Code by giving the Commission the authority to grant exceptions to Rule 10, thus allowing downhole commingling. *See* 1979 Tex.Gen. Laws, ch. 300, §§ 1–2, at 673–75. After the passage of this legislation, the Commission amended Rule 10 to allow exceptions and *further* amended Rule 10 to provide that commingled production be considered

production from a common source of supply for purposes of proration and allocation. In *Railroad Commission of Texas v. Mote Resources*, 645 S.W.2d 639 (Tex.App. —Austin 1983, no writ), the court held that while this legislation gave the Commission the authority to grant exceptions to Rule 10, it did not grant the Commission the authority to further amend Rule 10 to allow commingled production to be considered production from a common source of supply for proration purposes. After the Commission's order was entered, the order which was the subject of dispute in *Mote Resources*, the Legislature passed Senate Bill 1146 (1981 Tex.Gen.Laws, ch. 688, at 2578–80) which subsequently gave the Commission the authority to prorate the production from commingled reservoirs as if they were from a common source of supply.[6]

The Legislature's reaction to *Graford*, *Gage*, and *Mote Resources* demonstrates its hesitancy to grant the Commission a broad, general power to regulate commingled oil and gas. To date, the Legislature has given the Commission the authority to *prorate* the production from commingled reservoirs as if produced from a common source of supply.

MIPA expressly authorizes the Commission to pool tracts that are embraced in "a common reservoir." It is undisputed that the main sand and the stray sand do not physically constitute "a common reservoir." *Bishop* concluded that the authority to pool "a common reservoir" is limited to the pooling of *single* reservoirs or multiple reservoirs that are in natural communication with each other.

Rule 10 currently allows the Commission to treat separate reservoirs as a common reservoir *for proration and allocation purposes*. The legislative history underly-

---

ervoir"; however, it is defined in Tex.Nat.Res. Code Ann. § 85.001 (Vernon 1978) as: a "pool," "common pool," "field," or "common source of supply."

**5.** The statutory provisions supporting the Commission's authority under Rule 10 are contained in Tex.Nat.Res.Code Ann. §§ 51.291–51.303, 52.-291–52.296, 81.001–113.234, 131.001–131.270, 141.001–141.079. (Vernon 1978 and Vernon

Supp.1990). Because multiple sections of the Natural Resources Code are involved in our discussion of the Commission's "Rule 10," any reference made to "Rule 10" is intended to incorporate the underlying Code provision(s).

**6.** The court's holding in *Mote Resources* affected only those Commission orders issued before Senate Bill 1146 became effective on June 16, 1981.

ing Rule 10 does not indicate an intent on the part of the Legislature to expand the Commission's authority to pool under MIPA. On the contrary, the caselaw and statutory amendments reflect that the Legislature expanded the authority of the Commission under Rule 10 incrementally, gradually increasing the scope of the Commission's authority. It is not reasonable to conclude that, by amending the statutes supporting Rule 10, the Legislature intended to give the Commission broader power under MIPA than that expressly stated in MIPA. MIPA supplies the sole source of the Commission's pooling authority which is clearly limited to tracts underlaid by "a common reservoir," a term defined consistently by Texas courts.[7]

■ We hold that the granting of a Rule 10 commingling exception does not alter the Commission's authority to pool. By the plain limitations of MIPA, the Commission had no authority to enter the MIPA order pooling *both* the stray sand and the main sand as a common reservoir. We expressly reject the Commission's attempt to bootstrap its pooling authority through its granting of a Rule 10 commingling exception.

■ Finally, appellees argue that because appellants sought a Rule 10 exception and benefited from it, appellants should be estopped from challenging the Commission's authority to pool. We do not agree. Subject-matter jurisdiction is so important and essential that it has long been held that it cannot be conferred by estoppel. *Daniel v. Dallas Independent School District*, 351 S.W.2d 356, 359 (Tex.Civ.App. —El Paso 1961, writ ref'd n.r.e.). It is a statutory creation or enactment, not waived or conferred by estoppel, and a court without jurisdiction simply cannot render a valid judgment. *See Nevitt v. Wilson*, 116 Tex. 29, 285 S.W. 1079, 1084 (1926). Just as a court, the Commission's authority to pool is provided by statute, and the application of estoppel principles

will not affect its subject-matter jurisdiction.

Because the Commission had the authority to pool either the stray sand or the main sand (provided that the other jurisdictional requirements of MIPA were met), it exceeded its jurisdiction only to the extent that it pooled both sands in one MIPA proceeding. Thus, to the extent that the Commission exceeded its authority by pooling two separate reservoirs, we reform the Commission's order, vacating that portion of the order pooling the stray sand and affirming that portion of the order pooling the main sand. *See* Tex.R.App.P. 80(b)(2). A remand to the Commission is unnecessary. *See Buttes Resources Co. v. Railroad Commission of Texas*, 732 S.W.2d 675, 680 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); Tex.Rev.Civ.Stat. Ann. art. 6252–13a § 19(e)(2). Appellants' first three points of error are sustained.

By points four, five, and six, appellants contend that the Commission should have dismissed the pooling application because Forney did not meet the jurisdictional prerequisite of Tex.Nat.Res.Code § 102.013 (Vernon 1978) (MIPA). Section 102.013(b) states: "The commission shall dismiss the application if it finds that a fair and reasonable offer to pool voluntarily has not been made by the applicant." MIPA does not define a "fair and reasonable offer." The only portion of MIPA that lends any assistance is contained in Tex.Nat.Res.Code § 102.013(c): "An offer ... to share on the same yardstick basis as the other owners within the existing proration unit are then sharing shall be considered a fair and reasonable offer."

Although Texas courts have discussed various criteria used to determine whether a fair and reasonable offer has been made, no Texas court has defined a "fair and reasonable offer." The Supreme Court has addressed this issue once.

---

7. The term "common reservoir" means common source of supply, and to constitute a common reservoir, accumulations of oil or gas must be in natural communication with each other. *Gage v. Railroad Commission of Texas*, 582 S.W.2d 410, 413 (Tex.1979); *Railroad Commission of Texas v. Graford*, 557 S.W.2d 946, 950 (Tex. 1977); *Railroad Commission of Texas v. Mote Resources*, 645 S.W.2d 639, 643 (Tex.App.—Austin 1983, no writ).

In *Carson v. Railroad Commission of Texas,* 669 S.W.2d 315 (Tex.1984), the Court initially stated that the question whether an offer to pool is fair and reasonable "is not a substantial evidence review ... it is a jurisdictional review." *Carson,* 669 S.W.2d at 316. Later in the opinion, the Court declared, "the offer must be one which takes into consideration those relevant facts, existing at the time of the offer, which would be considered important by a reasonable person in entering into a voluntary agreement concerning oil and gas properties." *Carson,* 669 S.W.2d at 318. *Carson* has been criticized for its apparent contradiction regarding the appropriate standard for judicial review of a fair and reasonable offer. *See Railroad Commission of Texas v. Broussard,* 755 S.W.2d 951, 953 n. 1 (Tex.App.—Austin 1988, writ denied). By its express terms, *Carson* dictates that the proper review of this issue is not a substantial evidence review; however, it explicitly states that the relevant facts shall be considered. Just as the Austin court was in *Broussard,* we are in a quandary as to what standard to apply. Judicial review of the "relevant facts" simply must be accomplished by application of the substantial evidence rule, the only permissible review for the Commission's fact findings. *See Buttes Resources Co. v. Railroad Commission of Texas,* 732 S.W.2d 675, 680 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); *see also* Tex. Rev.Civ.Stat.Ann. art. 6252–13a § 19(e)(5) (Vernon Supp.1990) (Administrative Procedure and Texas Register Act) ("APTRA"). Consequently, we will analyze Forney's offer under both a jurisdictional review and a substantial evidence review.

Applying a jurisdictional review, we find that the Commission made the necessary findings of fact and conclusions of law to support its granting of Forney's application to pool, taking into consideration the relevant facts which would be considered important by a reasonable person entering into a pooling agreement.[8] Essentially, the Commission found that (1) Forney's voluntarily offer to pool was made to the inter-

ested owners of the existing gas unit; (2) the proposed gas unit would consist of all productive acres in Forney's tract determined in the field hearing, by agreement of the parties, or consisting of 50 out of the proposed 340 acres; (3) the operator of the unit would remain the same; (4) the existing operating agreement would remain in force; (5) Forney would pay its share of drilling and completion costs, plus a 100% risk factor; (6) each party would pay its proportionate share of operating costs, and (7) Forney would participate from the date of first production or from January 1, 1984.

■■■ It is clear that the offer must be fair and reasonable from the standpoint of the party being force pooled. *Windsor Gas Corp. v. Railroad Commission of Texas,* 529 S.W.2d 834, 837 (Tex.Civ.App.— Austin 1975, writ dism'd as moot). The Forney offer is sufficiently definite regarding the essential terms; the amount of acreage to be pooled, the interval to be pooled, and the basis of participation are set forth in a reasonably acceptable manner. The Forney offer takes into consideration the allowable and allocation conditions present at the time it was made. The Forney offer precedes one of the two proposed participation dates. Based upon its findings of fact, the Commission made the requisite conclusion of law that the Forney offer was fair and reasonable. We find that the Commission has satisfied the jurisdictional requirements of MIPA (Tex.Nat. Res.Code § 102.013).

When applying a substantial evidence review, we must review the evidence and determine whether the Commission's factual findings are reasonable in light of the evidence presented on the points. *Broussard,* 755 S.W.2d at 955. We are aware that this Court should not substitute its judgment or conclusions drawn from the evidence for those of the Commission. *Buttes Resources,* 732 S.W.2d at 680. Having reviewed the relevant testimony adduced during both the MIPA hearing and the field hearing, which was incorporated into the MIPA hearing, we find that substantial evidence exists to support the fac-

---

8. It is undisputed that the Bennetts' well was draining gas from underneath Forney's acreage.

tual findings made by the Commission. Points of error four, five, and six are overruled.

By its seventh point of error, appellant Pend Oreille contends that Forney failed to demonstrate his standing to invoke the protections of MIPA.[9] Tex.Nat.Res.Code § 102.011 (Vernon 1978) states, in relevant part: "the commission ... for the purpose of avoiding the drilling of unnecessary wells, protecting correlative rights, or preventing waste, shall establish a unit and pool all of the interests...." Pend Oreille's argument is two-fold: first, that there is no evidence that pooling would avoid the drilling of an unnecessary well and second, that Forney did not establish his right to invoke MIPA to protect his correlative rights.

■ With regard to Pend Oreille's first claim, the Commission found that the Bennetts' well was capable of draining all of the productive sand within the Forney tract and that, from the well's completion, it had been draining the Forney tract. The Commission expressly found that the drilling of another well was unnecessary to produce the hydrocarbons. There is substantial evidence contained in the record to support this finding. Pend Oreille argues, "Testimony that another well is not needed is not equivalent to testimony that pooling will prevent the drilling of an unnecessary well." We disagree. Testimony that another well is "not needed" clearly constitutes testimony that another well is unnecessary. With this determination made, we need not discuss Pend Oreille's second contention because § 102.011 requires substantial evidence of only one of the three reasons authorizing the Commission to pool. *See Broussard v. Texaco, Inc.*, 479 S.W.2d 270 (Tex.1972). Forney has adequately shown that pooling would prevent the drilling of an unnecessary well. Pend Oreille's seventh point is overruled.

■ By points eight, nine, and ten, appellants assert that the Commission lacked the authority to enter the final MIPA order with an effective date preceding the date of

the final order. The Commission's final order was entered on August 24, 1987, and was made retroactive to May 7, 1984. As stated earlier in this opinion, the Commission held two initial hearings in which it postponed any decision regarding Forney's MIPA application until final resolution of the field hearing. However, the Commission entered an interim order on May 7, 1984, designed to protect Forney's rights until a decision was reached in the MIPA proceeding. The interim order provided that the Bennetts' well receive an increased allowable, and the proceeds therefrom be placed in escrow, pending the outcome of the MIPA proceeding.

Generally, a MIPA order affects vested property rights and cannot be made retroactive. *American Operating Co. v. Railroad Commission of Texas*, 744 S.W.2d 149, 156 (Tex.App.—Houston [14th Dist.] 1987, writ denied); *Buttes Resources*, 732 S.W.2d at 682–83. However, the present case is distinguishable because neither *American Operating* nor *Buttes Resources* involved the issuance of an interim order. In *Buttes Resources* the court stated: "the earlier effective date resulted in an unconstitutional retroactive interference with vested property rights ... MIPA is clearly 'in derogation of the right of one to do with his own property as he so desires.'" *Buttes Resources*, 732 S.W.2d at 682 (citations omitted).

In the instant case, appellants were granted an increased allowable from the existing well as if the proposed pooled unit had been established. The proceeds from the *additional* production were ordered placed in escrow. By issuing an interim order increasing the allowable based on the size of Forney's proposed unit, there was no interference with the vested property rights of appellants to the extent of the additional production attributable to the additional allowable, as they would have otherwise been unable to extract any additional gas from the field.

**9.** While Pend Oreille characterizes the issue as a "standing" issue, we believe the issue involves not the applicant's standing but the Commission's authority to pool.

Appellants also challenge their obligation to escrow funds after September 9, 1985, the date on which the final order was entered in the field hearing. The final field order (1) amended the allocation formula for the Limes field, changing the method for calculating the allowable from surface acreage to net acre-feet, and (2) failed to provide for the continued assignment of the additional allowable for the Bennetts' well. Thus, appellants contend that as of September 9, 1985, the interim order was no longer effective because appellants were not receiving any increased allowable from which to derive escrow funds. Appellees assert, however, that appellants could have protected themselves from this situation by filing a motion with the Commission, requesting modification of the interim order.

Based upon our review of the final field order and the examiner's recommendations upon which the order is based, we hold that application of the final MIPA order between September 9, 1985 and August 24, 1987, contradicts the rule set forth in *American Operating* and *Buttes Resources*. Once the final field order was issued, the method of calculation for the allowables changed and there was no longer any increased allowable provided for the Bennetts' well. Because this field order did not provide for any supplementary allowable for the Bennetts' well, the retroactivity, as applied to the period between the final field order (September 9, 1985) and the final MIPA order (August 24, 1987), interferes with appellants' vested property rights and is unconstitutional. However, the retroactivity as applied to the period between the interim order (May 7, 1984) and the final field order (September 9, 1985) does not interfere with appellants' vested property rights. Furthermore, contrary to appellees' position, we believe that any burden to seek modification of the interim order was on the MIPA applicant, Forney. The field order impacted appellants' obligations under the interim order— it changed the formula for determining allowables and did not provide for the additional allowable. Because Forney was a party to the field hearing as well as the MIPA hearing, he was fully aware of the contents of the final field order. The escrowing of additional allowable under the interim order was for Forney's benefit (it was the source from which he would potentially recover for his extracted hydrocarbons). Therefore, if any party had an obligation to either seek modification of the interim order or request that an additional allowable be provided for in the final field order, it was Forney. This result is most consistent with well-established legal principles requiring the party seeking relief to shoulder the burden of moving forward.

We find that the final MIPA order establishing a retroactive date of May 7, 1984 is constitutional as applied to the period of May 7, 1984 to September 8, 1985, and further find that it is unconstitutional as applied to the period of September 9, 1985 to August 24, 1987. We sustain appellants' eighth, ninth, and tenth points of error in part.

By virtue of our decision regarding points of error one, two, and three, we REVERSE IN PART, AFFIRM IN PART the judgment of the district court and PARTIALLY VACATE the Railroad Commission's order as it was in excess of the Commission's statutory authority under Tex.Nat.Res.Code § 102.011 (Vernon 1978). *See* Tex.Rev.Civ.Stat.Ann. art. 6252–13a § 19(e)(2).

DORSEY, J., concurs.

DORSEY, Justice, concurring.

The Mineral Interest Pooling Act, MIPA, authorizes forced pooling when two or more separately owned tracts of land are embraced in a common reservoir. Here, the Bennett and Forney tracts are embraced in not one, but two common reservoirs: the main and stray sands. Thus, the issue presented is whether the Commission has authority, under MIPA, to order two "common reservoirs" pooled in one MIPA proceeding.

In *Railroad Comm'n v. Bishop*,[1] the court held that the MIPA language "a common reservoir" requires that separated pools or reservoirs be in natural communication in order for the Commission to have jurisdiction to order pooling. I question whether the holding in *Bishop* is indeed a correct statement of the law. The *Bishop* court's singular construction of "a common reservoir" is unnecessarily restrictive and contrary to the express statutory purposes of MIPA: avoiding the drilling of unnecessary wells, protecting correlative rights and preventing waste. Tex.Nat.Res.Code Ann. § 102.011 (Vernon 1978).

In the instant case, appellees present compelling arguments for the proposition that the Commission properly ordered the two reservoirs pooled. But for *Bishop*, I would agree. However, given the current precedential status of *Bishop*, I must concur with the majority in holding that the two reservoirs in the instant case cannot be pooled in one MIPA proceeding.

**1.** 736 S.W.2d 724 (Tex.App.—Waco 1987), *rev'd on other grounds in part, aff'd in part*, 751   S.W.2d 485 (Tex.1988).