**RAILROAD COMMISSION OF TEXAS, et al, Appellants,**

v.

**BISHOP PETROLEUM, INC., Appellee.**

No. 10–86–140–CV.

Court of Appeals of Texas, Waco.

Decided May 28, 1987.

Rehearing Denied June 25, 1987.

Jim Mattox, Atty. Gen., Mary F. Keller, Executive Asst. Atty. Gen. for Litigation, Larry J. Laurent, Sp. Asst. Atty. Gen., Environmental and Natural Resources Group, Fernando Rodriguez, Asst. Atty. Gen., Chief, Energy Div., Diane Weidert Morris, Asst. Atty. Gen., and John W. Camp, Scott, Douglass & Luton, Austin, for appellants.

Lloyd A. Muennink and Richard B. Edgell, Law Offices of Lloyd A. Muennink, Austin, and Joe Cannon, Cannon & Simmons, Groesbeck, for appellee.

## OPINION

THOMAS, Justice.

The principal question in this appeal is whether the Mineral Interest Pooling Act authorizes the Texas Railroad Commission to forcibly pool two tracts which are underlaid by deposits of oil or gas that do not fit within the definition of a "common reservoir" in section 86.002(4) of the Texas Natural Resources Code. *See* Tex.Nat.Res. Code Ann. § 86.002(4) (Vernon 1978). The holding is that the Commission's pooling authority is limited by that definition and that it can only pool tracts which are embraced in a reservoir whose deposits, if separated, are in natural communication.

Wiggins Brothers, Inc. filed an application with the Commission to pool its working interest in a 69.629-acre tract with an adjacent 634.371-acre tract in which the working interest was owned by Bishop Petroleum, Inc. The two tracts are located in the Donie (Pettit) Field which, all parties agree, contains multiple stratas and lenticular reservoirs of oil and gas.[1] The Commission ordered the tracts pooled over Bishop Petroleum's opposition and required Wiggins Brothers to pay Bishop Petroleum a 50% "risk penalty" plus a proportionate share of the costs incurred by Bishop Petroleum in drilling the Eppes No. 1 Well located on the larger tract.[2] Bishop Petroleum appealed the pooling order to the district court in Freestone County where the tracts are located. The Commission and Wiggins Brothers appeal from the judgment of the district court which reversed the pooling order and remanded the cause to the Commission with an instruction that it dismiss the proceeding for want of jurisdiction. The judgment will be reversed and a judgment rendered affirming the pooling order.

The Mineral Interest Pooling Act, originally adopted in 1965 as article 6008c, now appears in the Texas Natural Resources Code. *See* Tex.Nat.Res.Code Ann. §§ 102.-001–.112 (Vernon 1978 and Vernon Supp. 1987). Section 102.011 of the Act provides:

When two or more separately owned tracts of land are *embraced in a common reservoir* of oil or gas for which the [Texas Railroad Commission] has established the size and shape of proration units, whether by temporary or permanent field rules, and where there are separately owned interests in oil and gas within an existing or proposed proration unit *in the common reservoir* and the owners have not agreed to pool their interests, and where at least one of the owners of the right to drill has drilled or has proposed to drill a well on the existing or proposed proration unit *to the common reservoir*, the [Texas Railroad

---

1. A "lenticular reservoir" is a lens of porous and permeable sediments surrounded by strata of low permeability, often shale. There may be a number of such lens unconnected with each other in an area. Such reservoirs are often small, but completely saturated with oil or gas. The shoestring sands of the mid-continent region are notable examples of lenticular reservoirs. *Gage v. Railroad Commission*, 582 S.W.2d 410, 414 n. 4 (Tex.1979). A "lens" is a relatively porous, permeable, irregularly shaped, sedimentary deposit surrounded by impervious rock. The lens may serve as a local center of concentration of oil in the formation. *Id.*

2. A reference to "Wiggins Brothers" shall include Walter Farrington, Michael C. Tynes, J. Waggoner Tynes, and the estate of Jack W. Tynes, who were also applicants before the Commission and are now appellants.

Commission], on the application of an owner specified in Section 102.012 of this code and for the purpose of avoiding the drilling of unnecessary wells, protecting correlative rights, or preventing waste, shall establish a unit and pool all of the interests in the unit within an area containing the approximate acreage of the proration unit, which unit shall in no event exceed 160 acres for an oil well or 640 acres for a gas well plus 10 percent tolerance.

*Id.* at § 102.011 (Vernon 1978) (emphasis added). Although the legislature did not define "common reservoir" in the Act, it had previously defined that term in section 2(c) of article 6008. *See* Tex.Rev.Civ.Stat. Ann. art. 6008, § 2(c) (Vernon 1962).

▬ The initial question is whether the legislature intended, when it adopted the Mineral Interest Pooling Act, to give the term "common reservoir" the same meaning as the statutory definition. When the legislature has clearly defined a term in a statute and then subsequently uses that same term in a similar statute, without indicating that a different meaning is intended, a presumption arises that it intended the term to have the same meaning as the definition in the prior statute. *See Brown v. Darden,* 121 Tex. 495, 50 S.W.2d 261, 263 (1932). The sequence of events supports a logical presumption that the legislature intended the term "common reservoir", as used in the Mineral Interest Pooling Act, to have the same meaning as the statutory definition.

▬ That definition is now contained in section 86.002(4) of the Natural Resources Code:

"Common reservoir" means all or part of any oil or gas field or oil and gas field that comprises and includes any area that is underlaid or that, from geological or other scientific data or experiments or from drilling operations or other evidence, appears to be underlaid by *a common pool or accumulation* of oil or gas or oil and gas.

Tex.Nat.Res.Code Ann. § 86.002(4) (Vernon 1978) (emphasis added). Court decisions have elaborated on the meaning of this definition and the type of deposits that fit within it. *See Gage v. Railroad Commission,* 582 S.W.2d 410, 413 (Tex.1979); *Railroad Com'n v. Graford Oil Corp.,* 557 S.W.2d 946, 950 (Tex.1977). "Common pool," "common source of supply," and "common reservoir" are synonymous terms. *Gage,* 582 S.W.2d at 413 (citing Tex.Nat.Res.Code Ann. § 85.001(2) (Vernon 1978)). Because the legislature wrote the definition in terms of natural communication, separated pools of oil and gas must be in natural communication with each other before they qualify as a "common reservoir". *See id.* at 414. This is true even though the separated pools are in pressure communication through wellbores and underlie a single gas-producing area or field. *Id.* Thus, lenticular reservoirs, which are often separated, do not fall within the definition unless they communicate naturally. *See id.* Considering the clear meaning of the definition, the legislature must have intended, when it used the term "common reservoir" in the Mineral Interest Pooling Act, to limit the Commission's pooling authority to deposits in natural and not man-made communication. That legislative intent, having been ascertained, must be honored until it is changed by amendment. *See Manry v. Robison,* 122 Tex. 213, 56 S.W.2d 438, 447 (1932).

The Commission and Wiggins Brothers contend that the agency's pooling authority was broadened to include all separated deposits, regardless of whether they are in communication, by the 1979 and 1981 amendments to sections 85.046, 85.053, 85.-055, 86.012 and 86.081 of the Natural Resources Code. *See* Tex.Nat.Res.Code Ann. §§ 85.046(b), 85.053(b), 85.055(d), 86.012(b), 86.081(b) (Vernon Supp.1987). These sections, which are often referred to as the "commingling statutes", authorize the Commission to commingle, prorate and regulate production from multiple stratigraphic or lenticular deposits when necessary to prevent waste, promote conservation or protect correlative rights. *See Railroad Com'n of Texas v. Mote Resources,* 645 S.W.2d 639, 644 (Tex.App.—Austin 1983, no writ). The Commission and Wiggins Broth-

ers argue that the legislature must have intended to broaden the Commission's pooling authority to include lenticular or multiple stratigraphic deposits when it expanded the agency's regulatory authority to include those deposits. Bishop Petroleum contends that the pooling order should be reversed because Wiggins Brothers failed to prove by substantial evidence that the deposits under the two tracts communicated to the extent that production from the Eppes No. 1 Well on the larger tract would drain deposits under the smaller tract.

 The Mineral Interest Pooling Act has, from its inception, limited the Commission's pooling authority to tracts "embraced in a common reservoir". *See* Tex. Nat.Res.Code Ann. § 102.011 (Vernon 1978) (formerly Tex.Rev.Civ.Stat.Ann. art. 6008c, § 2(a) (Vernon 1962)). The legislature has never amended the Act to expressly broaden that authority or amended the definition of "common reservoir" to expressly include lenticular or multiple stratigraphic deposits. Consequently, an argument that the Commission's pooling authority was broadened by the amendments to the "commingling statutes" rests entirely upon implied legislative intent.

 Although the rules of statutory construction recognize implied legislative intent, interpretation by implication is limited to supplying the legislature's obvious but unexpressed intent. *Commonwealth of Massachusetts v. United N. & S.D. Co.*, 140 Tex. 417, 168 S.W.2d 226, 229 (1942). Furthermore, interpretation by implication cannot be used to extend a statute or when legislative intent can be ascertained from a reasonable interpretation of the statute's language. *Id.* A companion rule is that the existence or absence of legislative intent can be inferred from the absence or presence of a particular provision in a statute. *See Freels v. Walker*, 120 Tex. 291, 26 S.W.2d 627, 630 (1930). Application of these rules will determine whether the legislature intended, by implication, to simultaneously broaden the Commission's pooling authority when it expanded the agency's regulatory authority to include multiple stratigraphic or lenticular deposits.

Prior to the 1979 amendments, the Commission's regulatory authority was limited to oil and gas in a "common reservoir", which did not include separated deposits in man-made communication. *See Gage,* 582 S.W.2d at 414. Senate Bill 257, which enacted the 1979 amendments, was originally drafted to expand the definition of "common reservoir" to include "formations or geological sequences containing multiple stratigraphic or lenticular accumulations" in man-made communication. *See Mote Resources,* 645 S.W.2d at 643–44. However, the bill upon final passage did not amend the definition but added the following provision to sections 85.046 and 86.012 of the Natural Resources Code which pertain to waste:

> (b) Notwithstanding the provisions contained in this section or elsewhere in this code or in other statutes or laws, the commission may *permit production* by commingling oil or gas or oil and gas from multiple stratigraphic or lenticular accumulations of oil or gas or oil and gas where the commission, after notice and hearing, has found that producing oil or gas or oil and gas in a commingled state will prevent waste, promote conservation, or protect correlative rights.

Tex.Nat.Res.Code Ann. §§ 85.046(b), 86.012(b) (Vernon Supp.1987) (emphasis added). Although the 1979 amendments authorized the Commission to "permit production" by commingling multiple stratigraphic or lenticular deposits, they did not expressly authorize it to prorate such production. *See Mote Resources,* 645 S.W.2d at 644. The 1981 amendments, contained in Senate Bill 1146, expressly authorized the Commission to prorate and otherwise regulate production from the commingled deposits. *See* Tex.Nat.Res.Code Ann. §§ 85.053(b), 85.055(d), 86.081(b) (Vernon Supp. 1987).

The legislature's intent can be ascertained from what it did and did not do. Although it could have easily done so, the legislature did not amend the Mineral Interest Pooling Act or amend the statutory definition of "common reservoir" to include multiple stratigraphic or lenticular depos-

its. Because it deleted the language which would have amended the definition from the original draft of Senate Bill 257 and substituted language which amended the sections pertaining to waste, a reasonable inference is that the legislature did not intend to expand the definition of "common reservoir" to include multiple stratigraphic or lenticular deposits. *See Freels*, 26 S.W.2d at 630. Furthermore, the absence of similar amendments to the Mineral Interest Pooling Act leads to a logical inference that the legislature also did not intend, by the 1979 and 1981 amendments, to broaden the Commission's pooling authority to include deposits not already included within the statutory definition of "common reservoir". *See id.*

The Commission and Wiggins Brothers rely on implied legislative intent, contending that the legislature must have intended to expand the Commission's pooling authority to include multiple stratigraphic and lenticular deposits when it expanded its authority to regulate those deposits. They construe the term "regulate", being all-inclusive in its meaning, as logically including the authority to pool. Generally, the interpretation placed upon a statute by the agency charged with its enforcement is entitled to weight in the judicial construction of that statute. *Calvert v. Kadane*, 427 S.W.2d 605, 608 (Tex.1968). However, the agency's interpretation will not be followed when it is, as here, contrary to the words of the statute. *See Citizens Nat. Bank of Paris, Ill. v. Calvert*, 527 S.W.2d 175, 180 (Tex.1975).

■ The Commission's regulatory authority, although broad, extensive and exclusive in the area of oil and gas, does not impliedly include the power to pool. *See Ryan Consolidated Petroleum Corp. v. Pickens*, 155 Tex. 221, 285 S.W.2d 201, 207 (1955). Thus, expansion of the Commission's regulatory authority did not automatically expand its pooling authority. Furthermore, legislative intent to expand the Commission's pooling authority cannot be implied from the passage of the 1979 or 1981 amendments because one cannot say that such intent was obvious but unex-

pressed. *See Commonwealth of Massachusetts*, 168 S.W.2d at 229. Interpretation by implication is not proper here because it would extend the Mineral Interest Pooling Act beyond its plain limitations. *See id.*

The Commission's expansive view of its pooling authority is erroneous and without any statutory basis. The "commingling statutes" are irrelevant to that authority, and the Commission does not have, as it believes, omnipotent authority to pool any deposits that it can regulate. Instead, the sole source of its authority is the Mineral Interest Pooling Act which clearly limits it to tracts underlaid by a "common reservoir" of oil or gas. *See* Tex.Nat.Res.Code Ann. § 102.011 (Vernon 1978). Furthermore, its authority is restricted by the definition of "common reservoir", which does not include deposits in man-made communication. *See Gage*, 582 S.W.2d at 414; Tex. Nat.Res.Code Ann. § 86.002(4) (Vernon 1978).

■ This narrow interpretation of the Commission's pooling authority does not, as the Commission and Wiggins Brothers argue, violate the rule of construction which requires a court to construe the new and old sections of a statute in a "harmonious whole, all sections mutually acting upon each other." *See Schlichting v. Texas State Board of Medical Exam*, 158 Tex. 279, 310 S.W.2d 557, 563 (1958). The amendments they rely on were not to the Mineral Interest Pooling Act but to the "commingling statutes". Moreover, to accept such an argument would be tantamount to holding that the Commission's regulatory authority requires or authorizes coextensive pooling authority, a viewpoint already rejected as erroneous. *See Ryan Consolidated Petroleum Corp.*, 285 S.W.2d at 207. The effect of the Commission's erroneous view will be discussed later in the opinion.

The Administrative Procedure and Texas Register Act, which governs the judicial review of the pooling order, requires an agency's final order to include "findings of fact and conclusions of law, separately stated." Tex.Rev.Civ.Stat.Ann. art. 6252–

13a, § 16(b) (Vernon Supp.1987). This requires the reviewing court to first determine what ultimate fact findings are necessary to sustain the order. *Texas Health Fac. v. Charter Medical-Dallas,* 665 S.W.2d 446, 449 (Tex.1984). These will be found in the statute which confers authority on the agency to act on a particular subject. *Id.* The next step is to compare the ultimate findings required by the statute with the ultimate fact findings in the order. Section 16(b) of the Administrative Procedure Act also provides that "[f]indings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the [ultimate fact] findings." Tex.Rev.Civ.Stat.Ann. art. 6252-13a, § 16(b) (Vernon Supp.1987). This provision requires the court to determine whether the order contains a sufficient statement of the basic or underlying facts for the reviewing court to fairly and reasonably say that the underlying facts support the ultimate fact findings required by the statute. *Charter Medical-Dallas,* 665 S.W.2d at 451. Underlying findings should be clear, specific, nonconclusory, and supportive of the ultimate fact findings. *Id.* at 452. Finally, the court must determine whether the agency's findings, inferences, conclusions, and decisions are reasonably supported by substantial evidence in the record made before the agency. *Id.*

The Mineral Interest Pooling Act requires the applicant to plead and prove by substantial evidence the following to invoke the Commission's pooling authority:

1. The applicant is "an owner specified in Section 102.012". (required by section 102.011)

2. The tracts to be pooled are separately owned and "embraced in a common reservoir". (required by section 102.-011)

3. The Commission has established the size and shape of proration units "for the common reservoir" by temporary or permanent field rules. (required by section 102.011)

4. The separately-owned interests in the oil and gas within the existing or proposed proration unit "in the common reservoir" have not agreed to pool their interests with the applicant's interest. (required by section 102.011)

5. The applicant has made "a fair and reasonable offer to pool voluntarily" with the owners of the other interests in the proposed unit. (required by section 102.013)

6. One of the owners of the drilling right has drilled or proposes to drill "to the common reservoir" on the existing or proposed proration unit. (required by section 102.011)

7. Pooling is necessary to avoid the drilling of unnecessary wells, to protect correlative rights or to prevent waste. (required by section 102.011)

8. The applicant's tract "reasonably appears to lie within the productive limits of the [common] reservoir". (required by section 102.018)

9. The state either does not have a direct or indirect interest in the tracts to be pooled or, if it does, it has consented to the pooling. (required by section 102.004)

10. Notice of the filing of the pooling application was issued in the form and manner prescribed by the Commission. (required by section 102.016)

The pooling order should have contained ultimate fact findings couched in the statutory language on all of these required elements. *See* Tex.Rev.Civ.Stat.Ann. art. 6252-13a, § 16(b) (Vernon Supp.1987).

Having determined what ultimate fact findings are required by the Mineral Interest Pooling Act, the next step is to compare the required findings with the ultimate fact findings in the pooling order. Major discrepancies exist between the two. Three of the ultimate fact findings required by the Act are that the tracts being pooled are "embraced in a common reservoir", that the owners of the interests in the oil and gas within an existing or proposed proration unit "in the common reservoir" have not agreed to pool their interests with the applicant's interest, and that an owner of the drilling right has drilled or proposes to drill a well on the existing or

proposed proration unit "to the common reservoir". *See* Tex.Nat.Res.Code Ann. § 102.011 (Vernon 1978). The pooling order does not contain any of these in the language required by the statute.

Instead, the Commission made the following findings of ultimate fact:

3. More than two separately owned tracts of land are embraced *in the Donie (Pettit) Field.*

4. There are separately owned interests in the oil and gas within the proposed 704 acre proration unit *in the Donie (Pettit) Field,* and the owners have not agreed to pool their interests to form such a unit.

5. Bishop Petroleum, Inc. is one of the owners of the right to drill within the proposed unit. On June 26, 1982, Bishop completed the Eppes Unit No. 1 Well which it operates on a 634.371 acre proration unit *in the Donie (Pettit) Field.* The well is located approximately 3375' from the NNE line and 6590' from the SE line of the Nathaniel Peck Survey A–820.

(Emphasis added). One must conclude that the Commission carefully substituted "Donie (Pettit) Field" for the term "common reservoir" when it stated these findings and that it carefully related the first finding to the Donie (Pettit) Field as a whole and not just to the two tracts being pooled.

Furthermore, the fact findings concerning the nature of the deposits are related to the Donie (Pettit) Field and not to the two tracts being pooled:

16. The *Pettit reservoir* classified as the *Donie (Pettit) Field* is characterized by some porosity developments and deposits which are not continuous and present in every well.

a. The predominant producing porosity (B Zone) is continuous in nine of the ten wells in the reservoir.

b. Some porosity developments are continuous in two or more wells but are not in each well.

c. A stratigraphic cross-section delineates at least 5 distinct hydrocarbon porosities.

(Emphasis added). Only in finding No. 7 did the commission partially restrict its findings of basic facts to the two tracts being pooled:

7. All of the 704 acres in the proposed, force-pooled unit reasonably appear to lie within the productive limits of the Donie (Pettit) Field.

a. The 69.629 acre tract and 634.371 acres in the original proration unit for the subject well are adjacent.

b. There is no evidence of faults or anomolies geologically separating [Wiggins Brothers'] 69.629 acres from the Donie (Pettit) Field.

c. The Pettit formation extends over several counties.

d. The subject 704 acres was subjected to the same depositional processes throughout.

■ An agency cannot avoid the requirement of section 16(b) of the Administrative Procedure Act by simply rewording the statutory criteria which the legislature has established as prerequisites to the exercise of its authority. *See Charter Medical-Dallas,* 665 S.W.2d at 451. Yet, this is what the Commission did when it reworded the ultimate fact findings required by the Mineral Interest Pooling Act to conform them to the erroneous view that its pooling authority is coextensive with its regulatory authority.

The pivotal legal issue before the Commission related to its statutory authority to pool deposits which were separated vertically and horizontally in the Donie (Pettit) Field. The hearing officer discussed the issue in his proposal for decision:

TEX.NAT.RES.CODE ANN. § 102.011 contains a condition that there be separate tracts of land "... embraced in a common reservoir...." The parties agree that the Donie (Pettit) Field consists of various zones of porosity which are not in communication and which come and go from wellbore to wellbore. [Bishop Petroleum] argues that it is improbable that one of the zones existing in the [Eppes No. 1] wellbore would extend 5700' to [Wiggins Brothers'] tract, and therefore, the condition cited above has

not been met. In other words, it is argued that [Wiggins Brothers] has not shown that the tracts are embraced in a common reservoir.

The condition has been met. The use of the term "common reservoir" in the [Mineral Interest Pooling Act] predates later statutes which allow the [Texas Railroad] Commission to regulate and prorate intervals that are not in natural communication as if they were a single common reservoir where necessary to protect correlative rights, prevent waste or promote conservation. TEX.NAT. RES.CODE ANN. §§ 85.046, 85.053, 85.-055, 86.012, 86.081. The [Mineral Interest Pooling Act] was not amended, nor did the later statutes except the [Act], to indicate that the "common reservoir" of the [Act] was not to be affected by the later statutes. Therefore, the [Mineral Interest Pooling Act] should be read to encompass those statutes. *To do otherwise would result in the [Commission] having authority to regulate and prorate combined intervals as one field, but not having the authority to order forced pooling in such field.*

(Emphasis added). The Commission also believed, judging from the following legal conclusions contained in the pooling order, that the amendments to the "commingling statutes" had impliedly expanded its pooling authority to include multiple stratigraphic and lenticular deposits:

10. Pursuant to Tex.Nat.Res.Code Ann., subsections 85.046, 85.053, 85.055, 86.012, 86.081 [the "commingling statutes"], it has been and is necessary to consider the Donie (Pettit) Field as one entity in order to prevent waste, protect correlative rights and promote conservation and regulate and prorate production from the individual porosity developments as one entity.

11. The Donie (Pettit) Field may be considered to be a common reservoir under the Mineral Interest Pooling Act pursuant to [the] Commission's authority to treat it as the same pursuant to Tex.Nat. Res.Code, subsections 85.046, 85.053, 85.-055, 86.012 and 86.081 [the "commingling statutes"].

The Commission's pooling authority is not interdicted just because hydrocarbons are deposited in separated reservoirs under the tracts to be pooled. If the tracts are underlaid by such deposits, then the key fact findings relate to the existence and type of communication between the separated deposits. Accordingly, the most glaring omissions in the underlying and ultimate fact findings are those which would have related to the disposition of the deposits under the two tracts, the continuity or separation of those deposits and, most critically, the existence and type of communication between the deposits, if they are separated. Without such findings one cannot say as a matter of law that the Commission exceeded its authority under the Mineral Interest Pooling Act when it pooled the two tracts.

Section 19(e) of the Administrative Procedure Act provides that the court "shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: ... (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(e)(6) (Vernon Supp.1987). The "arbitrary or capricious" standard in section 19(e)(6) is an "ultimate safeguard" against agency action that does not violate any other provisions of the Administrative Procedure Act or the agency's enabling statute. *Charter Medical-Dallas*, 665 S.W.2d at 454.

Such a situation occurs when, as here, an agency completely ignores the ultimate findings required by the statute which authorizes its action and, instead, bases its decision on non-statutory criteria. *See id.* The Commission ignored the standards in the Mineral Interest Pooling Act, which the legislature clearly intended as limitations on its authority, and partially based its decision on the "commingling statutes" which are irrelevant. The Commission relied on the "commingling statutes" as a source of its pooling authority

and focused its basic and ultimate fact findings on the Donie (Pettit) Field as a whole and not on the two tracts being pooled. It acted arbitrarily and capriciously when it based its decision on criteria outside of the Mineral Interest Pooling Act. *See id.*

Section 19(e) of the Administrative Procedure Act provides in part:

[T]he court ... shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) in violation of constitutional or statutory provisions;

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(e) (1)–(6) (Vernon Supp.1987). The court concluded in its judgment reversing the pooling order that the Commission had committed every error on this "laundry list" of violations and, in a separate legal conclusion, also held that the Commission had committed "fundamental error".

 The Administrative Procedure Act also provides that a party who desires to appeal from an agency's final decision in a contested case must, as a prerequisite to judicial review, (1) file a motion for a rehearing with the agency and (2) exhaust all administrative remedies available to him within the agency. *Id.* at §§ 16(e), 19(a). A party has not exhausted all administrative remedies until he files a motion for a rehearing with the agency and has it denied. *Lindsay v. Sterling*, 690 S.W.2d 560, 563 (Tex.1985). These two requirements, exhaustion of administrative remedies and preservation of error in a motion for a rehearing, are jurisdictional prerequisites

which cannot be waived by the parties. *Id.* The court also concluded that Bishop Petroleum had exhausted its administrative remedies.

 However, these two requirements do not bar judicial review when an agency has acted in excess of its jurisdiction or exercised authority beyond its statutorily-conferred powers. *City of Sherman v. Public Utility Com'n*, 643 S.W.2d 681, 683 (Tex.1983). Thus, a court has jurisdiction to reverse an administrative order when the agency has acted "in excess of [its] statutory authority", which is the second error listed in section 19(e), regardless of whether the error has been raised in a motion for a rehearing. Otherwise, the court lacks jurisdiction to reverse for any other error listed in section 19(e) unless the aggrieved party has exhausted his administrative remedies by raising the alleged error in a motion for a rehearing.

 The purpose of a motion for a rehearing is to give the agency notice that an appeal will be prosecuted if the final order is not changed. *Suburban Util. Corp. v. Public Util. Com'n*, 652 S.W.2d 358, 364 (Tex.1983). Therefore, allegations in the motion must be specific enough to fairly point out the alleged error so that the agency can either correct it or prepare to defend itself on appeal. *Id.* at 365. The court concluded that Bishop Petroleum's motion for a rehearing was "sufficiently definite to apprise [the Commission] of the error claimed".

 This opinion has pointed out several errors which were apparent on the face of the pooling order: the Commission omitted ultimate fact findings, failed to include findings of underlying facts, and acted arbitrarily and capriciously when it relied on the "commingling statutes" as a source of its pooling authority. However, the court could not reverse the pooling order just because these errors appeared on the face of the record. *See United Sav. Ass'n of Texas v. Vandygriff*, 594 S.W.2d 163, 170 (Tex.Civ.App.—Austin 1980, writ ref'd n.r. e.). It could only reverse for errors over which it had jurisdiction. *See Lindsay*, 690

S.W.2d at 563. A determination of the court's jurisdiction to reverse the pooling order requires a comparison of Bishop Petroleum's amended pleading in the district court with its motion for a rehearing before the Commission and a consideration of the errors asserted as a ground for reversal.

■ Bishop Petroleum first alleged in its amended petition that the pooling order should be reversed because "the Commission will be taking hydrocarbons from Bishop ... and giving them to [Wiggins Brothers] without compensation and without any claim of public purpose." The motion for a rehearing did not contain this specific allegation or a general allegation that the pooling order violated Bishop Petroleum's constitutional rights. A complaint that agency action violates a constitutional provision, which is the first error listed in section 19(e), must be preserved in a motion for a rehearing before it can be asserted in an administrative appeal. *See Lubbock Radio Paging v. Southwestern Bell Tel.*, 607 S.W.2d 29, 33 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.). Not having been preserved in the motion for a rehearing, the court lacked jurisdiction to reverse the pooling order based on the alleged violation of a constitutional provision. *See id.* Furthermore, the doctrine of fundamental error did not allow the court to consider the complaint that the pooling order violated Bishop Petroleum's constitutional rights. *See id.*

The Commission found that "[a]ll of the 704 acres in the proposed, force-pooled unit reasonably appear to lie within the productive limits of the Donie (Pettit) Field." Bishop Petroleum alleged in its pleading that substantial evidence did not support this finding. It had asserted in the motion for a rehearing that "it is completely illogical and totally inconsistent to make any statement to the effect that the [Wiggins Brothers'] tract reasonably appears to lie within the productive limits of the field"

until the Commission makes a productive acreage determination in the field.[3]

■ A complaint that a finding is not reasonably supported by substantial evidence, which is the fifth error listed in section 19(e), must also be preserved in a motion for a rehearing before the court has jurisdiction to consider it in an administrative appeal. *See United Sav. Ass'n of Texas*, 594 S.W.2d at 170. However, the question of substantial evidence is inevitably and implicitly raised in a motion for a rehearing by a general allegation that the evidence does not support a particular finding. *See id.* The allegation quoted above fairly notified the Commission that Bishop Petroleum was attacking the finding on the ground that it was not supported by any probative evidence. This preserved the question of substantial evidence for judicial review. *See id.*

The Commission found that pooling the two tracts was "necessary to protect correlative rights". Bishop Petroleum also attacked this finding in the amended petition as not being supported by substantial evidence. The "drainage" issue was a central theme of the motion for a rehearing because Bishop Petroleum questioned whether the record contained any evidence that production from the Eppes No. 1 Well, located on the larger tract, would drain deposits under the smaller tract owned by Wiggins Brothers. Despite all of the words devoted to the issues of drainage and correlative rights, Bishop Petroleum did not expressly allege in the motion for a rehearing that substantial evidence did not support the finding that issuance of the pooling order was necessary to protect correlative rights. However, the issue of substantial evidence is implicitly and inevitably raised in a motion for a rehearing by a general allegation that a particular finding is not supported by any evidence. *See United Sav. Ass'n of Texas*, 594 S.W.2d at 170. The allegations in the motion for a rehearing were specific enough to fairly notify the Commission that Bishop Petrole-

---

**3.** Bishop Petroleum filed an application asking the Commission to determine the productive limits of the Donie (Pettit) Field. The Commission denied the application, and Bishop Petroleum appealed the denial to the Austin Court of Appeals.

um was complaining that the correlative-rights finding was not supported by any evidence of drainage. This preserved the question of substantial evidence for judicial review. *See id.*

Bishop Petroleum also asserted in its amended petition that Wiggins Brothers "failed to submit substantial evidence to show that approval of their [pooling] application [was] necessary for avoiding the drilling of unnecessary wells or for preventing waste." This complaint was properly preserved for judicial review because it had been expressly raised in the motion for a rehearing.

Bishop Petroleum plead that the Commission lacked authority to commingle production from the two tracts because Wiggins Brothers had failed to show by substantial evidence that such commingled production was necessary to prevent waste, promote conservation or protect correlative rights. This complaint was preserved for judicial review by similar allegations in the motion for a rehearing.

■ Bishop Petroleum questioned in the amended pleading whether the Commission had exceeded its jurisdiction: "Review of the record of the proceedings before the Commission will therefore show ... that the Commission was without jurisdiction to enter any order ... and that the [original and amended pooling orders] are unlawful and invalid." A court has jurisdiction to consider a complaint alleging that an agency has acted in excess of its statutory authority, although such complaint has not been preserved in a motion for a rehearing before the agency. *City of Sherman,* 643 S.W.2d at 683. Thus, the question of the Commission's jurisdiction was properly before the court in the administrative appeal, regardless of whether it had been raised in Bishop Petroleum's motion for a rehearing.

■ The Commission found that drilling the Eppes No. 1 Well "was not highly risky" and that assessing a 50% risk penalty against Wiggins Brothers was "compensatory for the risk associated with the well." Bishop Petroleum attacked this finding in its motion for a rehearing by asserting that drilling the Eppes No. 1 Well

was "inherently risky" and arguing that the Commission should have assessed Wiggins Brothers a risk penalty of 100%. This complaint, which essentially questioned whether substantial evidence supported the finding that a 50% risk penalty "was compensatory for the risk associated with the well", was preserved for judicial review because it had been raised in the motion for a rehearing. *See United Sav. Ass'n of Texas,* 594 S.W.2d at 170.

Bishop Petroleum also alleged in the amended pleading that the pooling order should be reversed because Wiggins Brothers' voluntary pooling offers were not accompanied by a completed operating agreement. The court lacked jurisdiction to consider this point because it had not been raised in the motion for a rehearing. Bishop Petroleum also alleged in the amended pleading that Wiggins Brothers' voluntary offers to pool were not reasonable because they had not offered to pay a 300% risk penalty. This point, which was not raised in the motion for a rehearing, was also not preserved for judicial review.

■ Finally, Bishop Petroleum asked the court to reverse the pooling order because the Commission's findings, inferences, conclusions, and decisions were in violation of constitutional or statutory provisions, in excess of its statutory authority, made upon unlawful procedure, affected by other error of law, not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole, and were arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. This allegation, which was a verbatim recital of the entire "laundry list" of errors in section 19(e), was not included in the motion for a rehearing. Therefore, the court lacked jurisdiction to reverse the pooling order on a blanket allegation that the Commission had committed all of the errors in section 19(e). However, the court did have jurisdiction to consider several alleged errors which appear on the list in section 19(e) because they were individually preserved for review.

Thus, the court had jurisdiction to consider the following alleged errors in a judicial review: (1) substantial evidence did not support a finding that "all of the 704 acres in the proposed, forced-pooled unit reasonably appear to lie within the productive limits of the Donie (Pettit) Field"; (2) substantial evidence did not support a finding that the pooling order was "necessary to protect correlative rights"; (3) substantial evidence did not support a finding that issuance of the pooling order was necessary "for avoiding the drilling of unnecessary wells or for preventing waste"; (4) the Commission lacked authority to commingle production from the two tracts because substantial evidence did not support a finding that such commingled production was necessary to prevent waste, promote conservation or protect correlative rights; (5) the Commission exceeded its jurisdiction when it pooled the two tracts; and (6) substantial evidence did not support the finding that a 50% risk penalty was "compensatory for the risk associated with the [Eppes No. 1 Well]".

Because they were not raised in the motion for a rehearing, the court lacked jurisdiction to reverse the pooling order on any of the following claimed errors: (1) the pooling order violated Bishop Petroleum's constitutional rights; (2) Wiggins Brothers' voluntary pooling offers had not been accompanied by a completed operating agreement; (3) Wiggins Brothers' voluntary offers to pool were not reasonable because they had not offered to pay a 300% risk penalty; and (4) Bishop Petroleum's substantial rights were prejudiced because the Commission's findings, inferences, conclusions, and decisions violated all of the provisions listed in section 19(e).

The main difficulty with this appeal is that the parties never focused their attention exclusively on the controlling issues under the Mineral Interest Pooling Act. Their attention was undoubtedly diverted by the Commission's erroneous belief that the "commingling statutes" had expanded its authority under the Mineral Interest Pooling Act. Bishop Petroleum, which accepted the Commission's expansive view of its pooling authority, did not object when the Commission attempted to conform its findings and conclusions to meet the requirements of the Mineral Interest Pooling Act and the "commingling statutes".

The Mineral Interest Pooling Act expressly limits the Commission's pooling authority to tracts that are underlaid by a "common reservoir", a term which only includes deposits that are continuous or, if separated, in natural communication. *See* Tex.Nat.Res.Code Ann. § 102.011 (Vernon 1978); *see also Gage*, 582 S.W.2d at 414. The Commission believed, judging from its findings and conclusions, that any tract which reasonably appeared to lie within the productive limits of the Donie (Pettit) Field must be embraced within a "common reservoir", as required by section 102.011 of the Mineral Interest Pooling Act, because the entire field qualified as a "common reservoir" under the "commingling statutes". Therefore, it attempted to support the pooling order by finding and concluding that the Donie (Pettit) Field was being treated and regulated as a common reservoir under the "commingling statutes" and that it could forcibly pool Wiggins Brothers' tract because it was embraced and reasonably appeared to lie within the productive limits of the field.

■ Bishop Petroleum, which accepted the Commission's flawed premise, did not allege in its motion for a rehearing that the Commission erred when it omitted ultimate fact findings required by the Mineral Interest Pooling Act, when it failed to make basic fact findings relating to the continuity of the deposits and the type of communication, if any, between any separated deposits underlying the two tracts, and when it based the pooling order on irrelevant criteria in the "commingling statutes". Consequently, none of these obvious errors were preserved for an administrative appeal.

The alleged errors which Bishop Petroleum did preserve for judicial review are understandably couched in the language of the Commission's findings and conclusions. This is best illustrated by the way Bishop Petroleum attacks the Commission's find-

ing that the entire 704 acres in the proposed unit "reasonably appear to lie within the productive limits of the Donie (Pettit) Field." Section 102.018 of the Mineral Interest Pooling Act requires the Commission to find that the applicant's tract "reasonably appears to lie within the productive limits of the [common] reservoir" before it can be pooled. Tex.Nat.Res.Code Ann. § 102.018 (Vernon 1978). The Commission's finding is patently defective because it is not limited to a "common reservoir", as defined in section 86.002(4) of the Natural Resources Code, but is related to the Donie (Pettit) Field as a whole. However, Bishop Petroleum ignores this obvious defect and, instead, alleges that the finding is not supported by substantial evidence.

Whether the 704 acres reasonably appear to lie within the productive limits of the Donie (Pettit) Field is irrelevant to the Commission's pooling authority, unless the entire field qualifies as a "common reservoir" under section 86.002(4). *See id.* at § 86.002(4). To qualify as a "common reservoir" under section 86.002(4), the entire field would have to be underlaid by deposits which are continuous or, if separated, in natural and not man-made communication. *See Gage*, 582 S.W.2d at 414. Although Bishop Petroleum did preserve for review an alleged error with respect to the finding, the court could not reverse the pooling order just because an irrelevant finding was not supported by substantial evidence. This discussion should be kept in mind as each alleged error is reviewed.

The Administrative Procedure Act, which authorizes a court to reverse an agency's final decision if it is not reasonably supported by substantial evidence, prohibits the court from substituting its judgment for that of the agency on the weight of the evidence relating to questions which the legislature has committed to the agency's discretion. *See* Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(e)(5) (Vernon Supp.1987). Furthermore, a court must presume that an agency's findings, inferences, conclusions, and decisions are reasonably supported by substantial evidence until the contrary is proven. *Charter Medical-Dallas*, 665 S.W.2d at 453. A finding is supported by substantial evidence, although the weight of the evidence may preponderate against the agency's decision, if the evidence supporting the finding amounts to more than a scintilla. *Id.* at 452. Consequently, the agency's decision must be upheld if the evidence will support either an affirmative or negative finding on a specific issue. *Id.* at 453. The true substantial-evidence test is not whether the agency has reached the correct conclusion, but whether reasonable minds could have reached the same conclusion, considering the evidence as a whole, that the agency must have reached to justify its action. *Id.* at 452.

The record of the Commission reflects that Max Powell, a registered petroleum engineer, testified on behalf of the Wiggins Brothers. He described the Pettit formation, which extends across several Central Texas counties and is the "host" formation of the Donie (Pettit) Field, as having at least five and possibly as many as eleven zones of porosity which could be identified in a single wellbore in the field. He stated that Wiggins Brothers' tract was "very well situated ... with respect to the acreage already assigned to the existing [Eppes No. 1 Well]". Powell admitted that the stratas "come and go" from wellbore to wellbore in the field, but he believed that, "perhaps", other stratas were present in the Pettit formation but had not yet been exposed in any wellbore. Powell also produced a map of the Donie (Pettit) Field which showed Wiggins Brothers' tract to be included within the productive limits of the field. Ten wells had been drilled in the field at the time of the hearing on the pooling application.

Jock Norman, Bishop Petroleum's vice-president, described the deposits in the Donie (Pettit) Field as just "little pods" or "stringers" of oil and gas whose "areal extent can be quite limited". He also confirmed that the Donie (Pettit) Field has at least five zones of porosity and that "no well has them all". However, Norman found "excellent correlation of the Pettit formation" in "all the wells without regard to how you may consider the porosity coming and going for various intervals". He

agreed under cross-examination that "if there is not natural communication throughout the Pettit interval ..., it is probably man-made communication". Norman said that he would be surprised if there was another "pod" under the Wiggins Brothers' acreage.

Kurt Miller, the head of geological operations for Wessley Energy, described the Donie (Pettit) Field as "a number of individual isolated oolitic pods, possibly not interconnected stratigraphically by either porosity or pressure". He believed that there was a "likelihood that [the Wiggins Brothers' acreage] would be productive from the Pettit [formation]", but said that it was "highly unlikely that it would be productive from any of the existing porosity zones".

The first question preserved for review was whether substantial evidence supported the finding that the smaller tract reasonably appeared to lie within the productive limits of the Donie (Pettit) Field. The testimony and documentary evidence produced by these witnesses, particularly by Max Powell, provided substantial evidence to support a finding that Wiggins Brothers' tract reasonably appeared to lie within the productive limits of the field. However, as already noted, the finding was irrelevant because the Commission did not also find that the entire field was underlaid by a common accumulation of oil or gas in natural communication. Such a finding, if made, would have established the entire field as a "common reservoir" under section 86.002(4) of the Natural Resources Code and would have made relevant the finding that the Wiggins Brothers' tract reasonably appeared to lie within the productive limits of the field.

An irrelevant finding does not have to be supported by substantial evidence under the Administrative Procedure Act. Furthermore, an appellant's substantial rights are not prejudiced if an irrelevant finding is not supported by substantial evidence. Therefore, the court could not reverse the pooling order on an alleged error, although preserved for judicial review, which complained that substantial evidence did not support a finding that the smaller tract reasonably appeared to lie within the productive limits of the Donie (Pettit) Field.

The second alleged error that Bishop Petroleum preserved for judicial review was that substantial evidence did not support the finding that forced pooling was "necessary to protect correlative rights". Section 102.011 of the Mineral Interest Pooling Act provides that the Commission cannot order forced pooling unless the purpose is to avoid the drilling of unnecessary wells, prevent waste *or* protect correlative rights. *See* Tex.Nat.Res.Code Ann. § 102.011 (Vernon 1978). The true test of substantial evidence is whether reasonable minds, considering the evidence as a whole, could have reached the same conclusion that the agency must have reached to justify its action. *Charter Medical-Dallas*, 665 S.W.2d at 453.

Reasonable minds could have concluded from the evidence as a whole that the two tracts are underlaid by the Pettit formation, which covers several counties in Central Texas, and that the Pettit formation contains deposits which are vertically separated into stratas. Reasonable minds could have also concluded that the Pettit formation has as many as eleven identified stratas, as well as other stratas which have not yet been identified, and that both tracts are underlaid by one or more of these identified or unidentified stratas. The evidence did not conclusively establish that the two tracts could not have been underlaid by a continuous strata, whether identified or not, or that the deposits in any strata underlying the two tracts could not, if separated, have been in natural communication. The testimony and documentary evidence outlined above was substantial enough to support a finding that production from the Eppes No. 1 Well would drain deposits under Wiggins Brothers' tract. Accordingly, substantial evidence supported the finding that forced pooling was "necessary to protect correlative rights".

The third complaint that Bishop Petroleum preserved for review was that substantial evidence did not support the finding

that forced pooling was necessary for "avoiding drilling of unnecessary wells or for preventing waste." This complaint, which is directed at findings which the Commission never made, was apparently based on the premise that substantial evidence would not support a finding that forced pooling was justified by any of the three purposes in section 102.011: (1) avoiding the drilling of unnecessary wells, (2) preventing waste, or (3) protecting correlative rights. *See* Tex.Nat.Res.Code Ann. § 102.011 (Vernon 1978).

■ Section 102.011 does not require the Commission to find that forced pooling is justified by all three purposes. A finding that forced pooling is justified by any of the three purposes, if supported by substantial evidence, is all that is required. Because substantial evidence supported the finding that forced pooling was "necessary to protect correlative rights", and any additional findings on the other two purposes would have been superfluous, the court could not reverse the pooling order on an alleged error, although preserved for review, which attacked omitted findings which the Commission was never required to make to justify its action.

Bishop Petroleum also preserved the question whether the Commission lacked authority to commingle production from the two tracts because substantial evidence did not support a finding that such commingled production was necessary to prevent waste, promote conservation or protect correlative rights. The "commingling statutes" authorize the Commission to commingle, prorate, and regulate production from multiple stratigraphic or lenticular deposits when necessary to prevent waste, promote conservation or protect correlative rights. *See* Tex.Nat.Res.Code Ann. §§ 85.046(b), 85.053(b), 85.055(d), 86.012(b), 86.081(b) (Vernon Supp.1987). The Commission made findings and conclusions establishing its authority under the "commingling statutes" to commingle and regulate production in the Donie (Pettit) Field as if the entire field were a common reservoir. It concluded that it was necessary to treat the field as one entity under the "commingling statutes" to prevent waste, promote conservation and protect correlative rights.

■ The "commingling statutes" are irrelevant to the Commission's pooling authority, and any findings or conclusions relating to the Commission's authority to treat the Donie (Pettit) Field as one entity or as a "common reservoir" under the "commingling statutes" were irrelevant. An irrelevant conclusion or finding does not have to be supported by substantial evidence, and Bishop Petroleum's substantial rights could not have been prejudiced by an irrelevant finding or conclusion not being supported by substantial evidence. Therefore, the court could not reverse the pooling order on the ground that substantial evidence did not support the irrelevant finding.

■ The court had jurisdiction to consider the complaint that the Commission exceeded its statutory authority when it pooled the two tracts. *See City of Sherman*, 643 S.W.2d at 683. As noted in the first portion of this opinion, the Commission's authority under the Mineral Interest Pooling Act is limited to tracts underlaid by a "common reservoir", as defined in section 86.002(4) of the Natural Resources Code, and that statutory definition does not include separated deposits unless they are in natural communication. *See Gage*, 582 S.W.2d at 414. Therefore, the Commission had authority to pool the two tracts, even if they were underlaid by separated reservoirs, as long as the separated deposits were in natural communication with each other. Some of the ultimate fact questions before the Commission related to the nature and disposition of the deposits under the two tracts, the continuity or separation of those deposits, and the existence and type of communication between any separated deposits. However, the Commission did not make ultimate or basic fact findings on these issues, and Bishop Petroleum failed to preserve any error relating to these omitted findings. Without such findings, one cannot say as a matter of law that the Commission exceeded its authority under the Mineral Interest Pooling Act. Based on the testimony and documentary

evidence outlined in this opinion, reasonable minds could have found and concluded that the two tracts were completely underlaid by a strata whose deposits were either continuous or, if separated, in natural communication. Because the evidence was substantial enough to have supported such findings on the omitted issues, the court could not, as it did, reverse the pooling order on the ground that the Commission had exceeded its authority.

The final complaint preserved for review was that substantial evidence did not support the finding that a 50% risk penalty "was compensatory for the risk associated with the [Eppes No. 1 Well]." The evidence did not conclusively establish that the 50% risk penalty assessed against Wiggins Brothers was unreasonably low. Reasonable minds could have concluded, based on the evidence as a whole, that considerable risk was associated with drilling the Eppes No. 1 Well, but that the risk was not so great as to warrant a 100% risk penalty. The finding that the 50% risk penalty "was compensatory for the risk associated with the well" is supported by more than a scintilla of evidence. Accordingly, the court could not reverse the pooling order on the alleged error that substantial evidence did not support the finding that a 50% risk penalty "was compensatory for the risk associated with the well."

A court is not bound by an agency's conclusions if its final decision is otherwise supportable. *See Charter Medical-Dallas*, 665 S.W.2d at 452. Likewise, an appellate court is not bound by a lower court's erroneous legal conclusions. *Muller v. Nelson, Sherrod & Carter*, 563 S.W.2d 697, 702 (Tex.Civ.App.—Fort Worth 1978, no writ). Therefore, the following conclusions of the district court, being erroneous, are not binding: (1) Bishop Petroleum had exhausted all of its administrative remedies before the Commission on all errors alleged in the amended petition; (2) the allegations in the motion for a rehearing were definite enough to notify the Commission of all the errors alleged in the district court; (3) substantial evidence did not support findings that pooling was necessary to protect correlative rights or that Wiggins Brothers' tract reasonably appeared to lie within the productive limits of any reservoir tapped by the Eppes No. 1 Well; (4) the Commission exceeded its statutory authority and jurisdiction; (5) substantial evidence did not support an assessment of a 50% risk penalty against Wiggins Brothers; (6) Wiggins Brothers' volunteer pooling offers were not reasonable because they had not offered to pay a 300% risk penalty under the operating agreement for the Eppes No. 1 Well; (7) the pooling order resulted in an "unconstitutional taking" of Bishop Petroleum's property; and (8) the "commingling statutes" are unconstitutional to the extent they permitted the Commission to take property from Bishop Petroleum without a public purpose. Furthermore, the conclusion in the judgment reversing the pooling order that the Commission had committed every error listed in section 19(e) of the Administrative Procedure Act is not binding on this court because it is also erroneous.

The briefs filed by the Commission and Wiggins Brothers contain identical points of error. They argued under their second point that the court erred when it denied their pleas to the jurisdiction which questioned whether the court could consider alleged errors that had not been preserved in the motion for a rehearing. The Commission and Wiggins Brothers alleged in their pleas that the court lacked jurisdiction to consider allegations that: (1) the Commission lacked authority to commingle production from the two tracts because substantial evidence did not support a finding that commingled production was necessary to prevent waste, promote conservation or protect correlative rights; (2) Wiggins Brothers' voluntary offers to pool were not accompanied by a completed operating agreement; (3) Wiggins Brothers' voluntary pooling offers were not reasonable because they did not offer to pay a 300% risk penalty; and (4) the pooling order violated Bishop Petroleum's constitutional rights.

The court should have granted both pleas because all of these alleged er-

rors, except the complaint alleging that the Commission lacked authority to commingle production from the two tracts under the "commingling statutes", had not been preserved for judicial review in Bishop Petroleum's motion for a rehearing. Although preserved for judicial review, the court could not reverse the pooling order on the ground that substantial evidence did not support the irrelevant finding relating to the Commission's authority under the "commingling statutes". Parties cannot waive the jurisdictional prerequisites which require the aggrieved party to exhaust all of his administrative remedies and preserve any alleged error by a motion for a rehearing before the agency. *Lindsay*, 690 S.W.2d at 563. Therefore, the court did not acquire jurisdiction to consider Bishop Petroleum's blanket allegation that the Commission had violated every error listed in section 19(e) of the Administrative Procedure Act just because the Commission and Wiggins Brothers failed to attack that allegation in their pleas to the jurisdiction. Point two is sustained.

The Commission and Wiggins Brothers allege in their first point that the court erred when it concluded that the Commission violated Bishop Petroleum's constitutional rights. This point is sustained because the complaint alleging that the pooling order violated a constitutional provision had not been raised in the motion for a rehearing. Accordingly, the court lacked jurisdiction to consider it. *See Lubbock Radio Paging*, 607 S.W.2d at 33.

The Commission and Wiggins Brothers allege in their third point that the Donie (Pettit) Field is subject to the Mineral Interest Pooling Act and that the court erred when it reversed the pooling order on the conclusion that the field was not a "common reservoir". This point is based on the erroneous premise that the Commission had the authority to pool any interest that it could regulate, an argument that has already been rejected. That the entire field may qualify as a "common reservoir" under the "commingling statutes" is irrelevant to the Commission's authority to pool the two tracts under the Mineral Interest

Pooling Act. The third point in each brief is overruled.

The Commission and Wiggins Brothers allege in point four that the court erred when it reversed the pooling order on the ground that it was not supported by substantial evidence. Point four is sustained because, as already discussed, all of the substantial-evidence complaints raised in the administrative appeal were without merit.

The fifth point of error is that the court erred when it concluded that Wiggins Brothers' voluntary pooling offers were not reasonable and reversed the pooling order. This point is sustained because complaints relating to the reasonableness of the voluntary pooling offers were not preserved for judicial review, and thus the court lacked jurisdiction to consider them as a ground for reversal.

The Commission and Wiggins Brothers contend in point six that the court erred when it reversed the pooling order on the conclusion that substantial evidence did not support a finding that the smaller tract reasonably appeared to lie within the productive limits of the Donie (Pettit) Field. The evidence was substantial enough to support a finding that the smaller tract owned by Wiggins Brothers reasonably appears to lie within the productive limits of the field, but that finding is irrelevant to the Commission's authority under the Mineral Interest Pooling Act. Therefore, the court could not reverse the pooling order on this particular complaint although it had been preserved for judicial review. Point six is sustained.

Their seventh point of error is that the court erred when it reversed the pooling order on a conclusion that substantial evidence did not support a correlative-rights finding. Point seven is sustained because the evidence was substantial enough to support that finding.

Point eight in both briefs must also be sustained. The Commission and Wiggins Brothers allege in this point that the court erred when it concluded that the 50% risk penalty assessed against Wiggins Brothers was not supported by substantial evidence.

Because the evidence was substantial enough to support this finding, point eight is sustained. Likewise, point nine is sustained because the Commission did not, as the court concluded, commit all of the errors listed in section 19(e) of the Administrative Procedure Act.

However, point ten is overruled. The Commission and Wiggins Brothers argue in this point that the court could not reverse the pooling order because the agency record was never offered and received into evidence as required by section 19(d)(3) of the Administrative Procedure Act. *See* Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(d)(3) (Vernon Supp.1987). The Commission record was filed with the district clerk, and the parties and the court referred to the record all through the hearing as if it had been formally offered and received into evidence. None of the parties ever objected to the record being considered because it had not been introduced and received into evidence. Furthermore, Wiggins Brothers and the Commission filed a joint motion with the district court to have the agency record transmitted to the appellate court. Having treated the record as if it had been properly introduced and received into evidence, the Commission and Wiggins Brothers cannot now attack the judgment on this point. *See Newsom v. Fikes,* 153 S.W.2d 962, 963–64 (Tex.Civ. App.—Fort Worth 1941, writ ref'd w.o.m.).

When Bishop Petroleum appealed the pooling order, Wiggins Brothers counterclaimed in the administrative appeal for an accounting and for recovery of its share of production from the two pooled tracts from July 9, 1984, the effective date of the pooling order. Wiggins Brothers also sought to recover "equitable prejudgment interest" from the date of "payout" of the Eppes No. 1 Well and reasonable attorney's fees. The Commission filed a motion to sever the counterclaim from the administrative appeal, pointing out that the standard of review for issues alleged in the counterclaim was by a preponderance of the evidence and that the standard for reviewing the pooling order in an administrative appeal was by the substantial-evidence rule. The Commission argued in the motion to sever that the court could not con-duct a hybrid review under the two inconsistent standards. Wiggins Brothers claim in point eleven that the court erred when it denied the counterclaim. This point cannot be sustained because the record of the hearing before the district court does not reflect that the counterclaim or the motion to sever, although filed with the clerk, were ever presented to the court and ruled on. Point eleven is overruled.

The district court could not reverse the pooling order on the alleged errors that Bishop Petroleum had preserved for review. Substantial evidence supported all of the findings which were attacked in the administrative appeal, and the court could not say as a matter of law that the Commission exceeded its statutory authority when it pooled the two tracts. Therefore, the district court entered an incorrect judgment when it reversed the pooling order with an instruction that the Commission dismiss the application for pooling for want of jurisdiction. The judgment is reversed and a judgment is rendered in favor of Wiggins Brothers and the Commission that the pooling order be affirmed and that all relief sought by Bishop Petroleum be denied.